Jose Antonio **BARRAZA RIVERA**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 89–70025.

United States Court of Appeals, Ninth Circuit.

Submitted March 16, 1990 *.

Decided Sept. 12, 1990.

---

* The petitioner moved for submission for decision on the briefs under Fed.R.App.P. 27, and the motion was granted March 13, 1990.

1444

Susan Giersbach Rascon, Arizona Center for Immigration, Phoenix, Arizona, and Richard A. Boswell, University of Notre Dame Law School, Notre Dame, Indiana, for the petitioner.

Karen L. Fletcher, Office of Immigration Litigation, Washington, D.C., for the respondent.

Before FLETCHER, PREGERSON and NELSON, Circuit Judges.

PREGERSON, Circuit Judge:

Jose Antonio Barraza Rivera ("Barraza") petitions for review of a decision of the Board of Immigration Appeals ("BIA" or "the Board"). The BIA dismissed Barraza's appeal and upheld the immigration judge's denial of Barraza's requests for political asylum and withholding of deportation under the Immigration and Nationality Act. 8 U.S.C. §§ 1158 and 1253(h). The Board also upheld the immigration judge's denial of Barraza's motions for remand of his case to the Bureau of Human Rights and Humanitarian Affairs ("BHRHA") and for discovery of the basis of the BHRHA advisory opinion. We have jurisdiction over Barraza's petition under 8 U.S.C. § 1105a. We grant the petition, reverse the BIA order, and remand for further proceedings.

## BACKGROUND

In December 1983, Barraza was forcibly recruited into military service in El Salvador, his home country. He entered training in January 1984 at a military headquarters in the city of La Union, and was trained in weaponry and self-defense for about 20 days. On or about January 13, 1984, Barraza took one or two hours off from training and went into town to apply for a passport. He applied for the passport on the advice of his mother, who was concerned about unlawful acts committed by the military.[1] He changed from military to civilian clothing to apply for the passport, and did not indicate military service on his

1. Barraza testified:

And then [my mother] told me one of these days [the military] is going to pick you up, and I don't want you to be there. [B]ecause ... the way they act is not in agreement with the law.

passport application.[2] After training, Barraza was sent to the city of Morazan for two weeks, where he backed up troops fighting guerrillas. He never engaged in battle. Barraza returned to military headquarters in La Union on January 31, 1984. He and approximately one-half of the 100 soldiers in his unit were given a three-day leave to visit family.

Before being dismissed for leave, Barraza was pulled aside from the group by a man he identified in his testimony as Lieutenant Calbo. According to Barraza:

> [H]e said prepare yourself when you return, because we have a commission. We're going to take two men to ... assassinate. And then I said why, it's an order he said, because they have paid me and I need the money. And then he said, what do you prefer, that they kill you or kill them? And then I said okay, as you say, lieutenant....

Barraza returned to formation and was dismissed for leave. He then picked up his passport. On February 4, 1984, he left El Salvador for the United States because, he testified, "it wasn't correct what I was going to be doing."

Barraza was apprehended by the INS near Brownsville, Texas, and was placed in deportation proceedings. He applied for political asylum.[3] The BHRHA prepared an advisory opinion on his application and sent it to the INS pursuant to applicable regulations.[4] A hearing on his asylum and withholding of deportation claims was held on December 18, 1985.

Barraza made two preliminary motions regarding the BHRHA advisory opinion. He moved for remand of his case to the BHRHA for further consideration of his asylum application and to compel discovery of the basis of the BHRHA opinion. The immigration judge denied both motions.

At the hearing, Barraza testified that he left El Salvador because he did not want to participate in killing the two men, and that he fears that, if returned to El Salvador, he faces persecution by both the military and the guerrillas. First, Barraza fears being punished for refusing to participate in paid assassinations. Second, he fears that the military will suspect that he is an informant for the guerrillas and will kill him for that reason. To support this claim, he testified that an uncle was beaten severely by soldiers in 1982 for suspected pro-guerrilla activity, and that another uncle and cousin were killed by soldiers, also in 1982.[5] Also, Barraza stated that in December 1983, a friend and fellow soldier was killed by a colonel in Barraza's unit at headquarters in La Union after being held for several days by guerrilla captors. The colonel apparently accused this friend of being a guerrilla informant. Third, Barraza fears that the guerrillas will kill him if he is returned to El Salvador because he was a member of the military. To support this claim, he testified that a friend was killed by guerrillas after being identified as a member of the national guard.

Barraza also stated that his family informed him that anonymous threats against him had been attached to the door of his family's home, beginning approximately two months after he entered the

2. Barraza testified that he did this because he was afraid of guerrillas and because he thought that immigration officials would question—and perhaps not accept—his application. Barraza also testified, however, that passports are granted to members of the armed forces.

3. Under INS regulations, a request for political asylum made in deportation proceedings is automatically treated as a request for withholding of deportation. 8 C.F.R. § 208.3(b) (1990).

4. 8 C.F.R. § 208.10 (1990) provides in relevant part:

> (b) *BHRHA advisory opinion.* When the asylum request is filed, the hearing will be adjourned for the the purpose of requesting an advisory opinion from BHRHA. The immigration judge shall not request an opinion if it has been received in connection with an application [to the INS district director] unless circumstances have changed so substantially since the first opinion was provided that a second referral would materially aid in adjudicating the asylum request. The BHRHA opinion, unless classified ..., will be made part of the record, and the applicant shall be given an opportunity to inspect, explain, and rebut it.

5. The record does not indicate why the military killed Barraza's uncle and cousin.

United States. Barraza received two letters from his family just days before his asylum hearing in December 1985 that warned him not to return to El Salvador because of recent anonymous threats. The letters' authenticity was not challenged at the asylum hearing, and the letters were admitted into evidence.

Finally, Barraza submitted background documentation regarding El Salvador's civil war, death squad activities, and the military. In particular, he submitted newspaper and magazine articles on increased levels of violence from both sides of the civil war and an Amnesty International report on widespread human rights violations. The Amnesty International report stated that military officials were known to work in "close conjunction" with certain repressive civilian paramilitary groups. Barraza also submitted to the Board on appeal an article that appeared in the March 1986 edition of *The Progressive.* The article described in detail the extensive involvement of the Salvadoran military in death squad activities, and included specific accounts of military officers ordering soldiers to participate in assassinations requested by wealthy private citizens.

The immigration judge denied Barraza's requests for political asylum and withholding of deportation. The BIA dismissed Barraza's appeal.

## DISCUSSION

In his petition to this court, Barraza contends that: (1) denial of his motions for remand to the BHRHA and for discovery of the basis of the BHRHA opinion letter was impermissible under the regulations and denied him due process; (2) the immigration judge and BIA failed to examine adequately the documentary evidence Barraza presented and violated his due process rights; and (3) the BIA erred by finding Barraza ineligible for political asylum and withholding of deportation. We address each argument in turn.

### I. State Department Advisory Opinion

Barraza contends that, by denying his motions for remand of his application to the BHRHA and for discovery of the basis of the opinion letter, the immigration judge violated his right to "inspect, explain, and rebut" the advisory opinion under 8 C.F.R. § 208.10(b) (1990). According to Barraza, the advisory opinion contained nothing that could be explained or rebutted, because it contained no information specific to his application and because it did not explain the basis of its conclusion that he failed to establish a well-founded fear of persecution.[6]

The Fifth Amendment guarantees due process in deportation proceedings. *Rios–Berrios v. INS,* 776 F.2d 859, 862 (9th Cir.1985). Aliens are also entitled by statute and regulation to certain specified legal protections—for example, a reasonable opportunity to present testimony in their own behalf, 8 U.S.C. § 1252(b); 8 C.F.R. § 242.16(a) (1990), and the opportunity to inspect, explain, and rebut an advisory opinion from the BHRHA, 8 C.F.R. 208.10(b) (1990). We have held that denial of statutory and regulatory rights "may constitute an abuse of discretion requiring remand." *Baires v. INS,* 856 F.2d 89, 91 (9th Cir.1988). If the prejudice to the alien is sufficiently great, denial of these rights may violate the constitutional guarantee of due process. *Id.*

We apply a two-part test to decide whether the immigration judge abused his discretion by denying Barraza's motions. First, the immigration judge's decision must have violated Barraza's statutory or regulatory rights; second, if it did, the

6. The advisory opinion states in relevant part:
Upon careful review of the information submitted, it is our view that the subject has failed to establish a well-founded fear of being persecuted in El Salvador within the meaning of the United Nations Protocol Relating to the Status of Refugees. We do not have any information supportive of the subject's request for asylum to bring to your attention. Should the subject submit any additional information regarding his/her request which you believe requires further consideration, we will be glad to review such additional information, or should there be specific areas of concern on which you would like us to comment, please let us know.

violation must have caused Barraza prejudice. *Castro-O'Ryan v. United States Dept. of Immigration & Naturalization,* 847 F.2d 1307, 1313 (9th Cir.1988). Here, we need not decide whether the regulations give Barraza a right to a more detailed advisory opinion, because we hold that, even if they do, the immigration judge's failure to remand Barraza's application to the BHRHA or allow discovery against the State Department did not prejudice Barraza. *See Vides-Vides v. INS,* 783 F.2d 1463, 1469 (9th Cir.1986); *Pereira-Diaz v. INS,* 551 F.2d 1149, 1154 (9th Cir.1977).

We find prejudice where an alien's rights are violated "in a manner so as potentially to affect the outcome of the proceedings." *United States v. Cerda-Pena,* 799 F.2d 1374, 1379 (9th Cir.1986). We have rejected a procedural due process challenge similar to Barraza's on the ground that a petitioner failed to establish prejudice where the immigration judge ruling on the asylum application indicated that he was not relying on the advisory opinion. *Pereira-Diaz v. INS,* 551 F.2d at 1153–54. In this case, the immigration judge, after denying Barraza's motions, stated: "[T]he weight that I give the document is, of course, another matter and, as you know, [the opinion] is rather conclusionary in its nature and doesn't give specific reasons. I personally don't feel that the document is terribly probative." Further, while Barraza sought information regarding the basis of the BHRHA's opinion, the BHRHA letter states that the BHRHA had no specific information on Barraza's case and indicates that the BHRHA based its opinion on the facts presented in Barraza's application. Barraza presented the same facts to the immigration judge and argued those facts through counsel at his asylum hearing.

Neither remand to the BHRHA nor allowing discovery against the State Department would have affected the outcome of the proceedings. Any error committed by the immigration judge in denying Barraza's motions was harmless.[7]

## II. Documentary Evidence

Barraza submitted a completed asylum application and extensive background information in support of his request for political asylum and withholding of deportation. He contends that he was denied due process because the BIA "failed to even consider" extensive background documentation he submitted.

The question whether an immigration proceeding violates due process is a legal issue and is reviewed de novo. *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We must determine whether the BIA failed to review adequately the background information Barraza submitted and thereby impinged upon the "fundamental fairness" of the proceedings in this case. *See Platero-Cortez v. INS,* 804 F.2d 1127, 1132 (9th Cir.1986); *Ramirez-Durazo v. INS,* 794 F.2d 491, 500 (9th Cir.1986).

The BIA must give some basis—in evidence found in the administrative record—for its determinations regarding deportation proceedings, *Santana-Figueroa v. INS,* 644 F.2d 1354, 1357 (9th Cir. 1981), and "general information concerning oppressive conditions is relevant to support specific information relating to an individual's well-founded fear of persecution," *Zavala-Bonilla v. INS,* 730 F.2d 562, 564 (9th Cir.1984). In this case, the BIA noted in its decision that Barraza's asylum and withholding of deportation claims rested on his testimony and the background information provided in his asylum application. That background information was in the record reviewed by the Board, but the BIA decision does not otherwise discuss the background information Barraza submitted. The BIA and the immigration judge did, however, examine at length the specific material facts alleged in Barraza's application and testimony, as well as the two

7. Our holding is consistent with BIA decisions on this issue. In *In re Exilus,* 18 I & N Dec. 276, 279 (B.I.A.1982), for example, the BIA held that, "as a general rule, ... the refusal of an immigration judge to permit submission of interrogatories to the State Department [does not] constitute[ ] a denial of due process."

letters from Barraza's family regarding threats against him, and Board Member Heilman discussed in his concurrence one important piece of background information—the article on the privately funded assassinations carried out by the Salvadoran military that appeared in *The Progressive.*

The Board's failure to discuss the background information Barraza submitted did not impinge upon the fundamental fairness of these proceedings. Barraza's due process rights were not violated.

### III. Political Asylum and Withholding of Deportation

Barraza advances two arguments for relief from deportation under the Immigration and Nationality Act. First, he contends that he faces persecution by the Salvadoran military because he abandoned military service and fled the country to avoid participating in an inhuman act. Second, he argues that, because of his association with the military, the Salvadoran guerrillas opposing the government will persecute him. We hold that Barraza proved his asylum eligibility under the first theory, and, therefore, do not address the second theory.

#### A. Legal Standards

Adjudication of a political asylum claim involves a two-step analysis. First, the alien must establish that he or she is eligible for asylum as a "refugee" under 8 U.S.C. § 1101(a)(42)(A). A "refugee" is one who is unable or unwilling to return to his or her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* Second, if statutory eligibility is established, the Attorney General may, as a matter of discretion, grant asylum. *See Diaz-Escobar v. INS,* 782 F.2d 1488, 1492 (9th Cir.1986).

The well-founded fear standard has a subjective and an objective component. *See Vides-Vides v. INS,* 783 F.2d at 1469. A showing of "genuine fear" satisfies the subjective component. *Diaz-Escobar v. INS,* 782 F.2d at 1492. The objective component is satisfied by "a showing, by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear that the petitioner faces persecution." *Id.* There must be some reasonable possibility of persecution. *INS v. Cardoza-Fonseca,* 480 U.S. 421, 440, 107 S.Ct. 1207, 1212, 94 L.Ed.2d 434 (1987); *Hernandez-Ortiz v. INS,* 777 F.2d 509, 513 (9th Cir.1985).

An applicant for political asylum may also be entitled to withholding of deportation. The Attorney General cannot return any alien to a country where his or her "life or freedom would be threatened ... on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h). To be entitled to mandatory withholding of deportation relief, the alien must show a "clear probability of persecution," i.e., that it is "more likely than not" that he or she will be persecuted if deported to his or her home country. *See INS v. Stevic,* 467 U.S. 407, 429–30, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984). The "clear probability" standard that applies to withholding of deportation is less generous than the "well-founded fear" standard that applies to asylum requests. *See INS v. Cardoza-Fonseca,* 480 U.S. at 421, 107 S.Ct. at 1207.

Barraza's case rests in large part on his own testimony. An alien's credible and persuasive testimony, standing alone, may establish eligibility for political asylum and withholding of deportation. *Cardoza-Fonseca v. United States INS,* 767 F.2d 1448, 1453 (9th Cir.1985), *aff'd, INS v. Cardoza-Fonseca,* 480 U.S. at 421, 107 S.Ct. at 1207. We "consider the alien's testimony carefully because an alien seeking asylum is often limited in the evidence he can obtain to show proof of potential persecution." *Platero-Cortez v. INS,* 804 F.2d at 1130; *see also Bolanos-Hernandez v. INS,* 767 F.2d 1277, 1285 (9th Cir.1984) (persecutors "hardly likely to provide their victims with affidavits attesting to their acts of persecution"); *Zavala-Bonilla v. INS,* 730 F.2d at 565 (alien "could hardly ask the authorities in El Salvador to certify that she would be persecuted should she return"). Here, the immigration judge found

that Barraza's testimony was not credible, but the Board *assumed* that the testimony was credible and reviewed Barraza's case, accepting the underlying facts of the claim as alleged. Where the BIA assumes that an alien is a credible witness and thus does not rule on the credibility question, we do not review an immigration judge's credibility determination. *See Argueta v. INS,* 759 F.2d 1395, 1397–98 (9th Cir.1985). Therefore, we assume for the purpose of this decision that the facts alleged in Barraza's testimony are true.[8]

B. Standard of Review

We review factual findings underlying the BIA's denial of asylum and withholding of deportation under the substantial evidence standard. *Canas–Segovia v. INS,* 902 F.2d 717, 721 (9th Cir.1990); *see also Arteaga v. INS,* 836 F.2d 1227, 1228 (9th Cir.1988); *Argueta v. INS,* 759 F.2d at 1397.

C. Objection to Participation in Inhuman Acts

Barraza was ordered by a military officer, under threat of death, to participate in the paid killing of two men. Barraza abandoned military service and fled El Salvador because he did not want to participate in the killings. He asserts that, if returned to El Salvador, he will be persecuted by the Salvadoran military because he refused to participate in the murders and deserted and because he will be suspected of pro-guerrilla activity. The BIA found that Barraza failed to establish a well-founded fear of persecution by the government, and, a fortiori, a clear probability of government persecution. The Board found that Barraza's fear of being persecuted as a suspected guerrilla sympathizer was not well-founded and also rejected Barraza's claim of persecution based on objection to military service.

We hold that the BIA's finding that Barraza failed to demonstrate a well-founded fear of persecution for his refusal to participate in paid assassinations is not supported by substantial evidence. Barraza demonstrated a well-founded fear of persecution based on his objection to participating in the murders under orders from a Salvadoran military officer, and is eligible for political asylum on that basis.[9]

Requiring military service and punishing deserters does not, per se, constitute persecution. *See Rodriguez–Rivera v. United States INS,* 848 F.2d 998, 1005 (9th Cir.1988); *Kaveh–Haghigy v. INS,* 783 F.2d 1321, 1323 (9th Cir.1986) (per curiam). We have, however, recognized conscientious objection to military service as grounds for relief from deportation. *See Canas–Segovia v. INS,* 902 F.2d at 726. The Board also has addressed the conscientious objector issue. *In re A–G–,* Interim Dec. 3040 (B.I.A.1987) (persecution when conscriptee would be required to engage in internationally condemned conduct), *aff'd sub nom. M.A. v. United States INS,* 899 F.2d 304, 312 (4th Cir.1990) (en banc); *In re Salim,* 18 I. & N. Dec. 311 (B.I.A.1982) (forced military service against compatriots may be grounds for asylum eligibility).

Both *Canas–Segovia* and *In re A–G–* involved aliens who left their countries to avoid potential military induction because they objected on religious or moral grounds to military service. Barraza, however, had already submitted to induction. He does not object to military service in general but to being forced to perform inhuman acts under military orders. We have understood "conscientious objection" in the United States to refer to objection to any military service, usually on religious grounds. In *Canas–Segovia,* we had before us this traditional form of conscientious objection, but we defined conscientious objector in the asylum context broadly: "A conscientious

8. Because we reverse the BIA's decision that Barraza failed to establish a well-founded fear of persecution, we must remand the case to the BIA for a ruling on Barraza's credibility. *See Damaize–Job v. INS,* 787 F.2d 1332, 1338 (9th Cir.1986); *Canjura–Flores v. INS,* 784 F.2d 885, 889 (9th Cir.1985).

9. Because we hold for Barraza on his claim that he faces persecution based on his refusal to participate in the assassinations, we do not reach the merits of his claim that he faces persecution as a suspected guerrilla sympathizer.

objector is one whose actions are governed by conscience, and persecution arises whenever that conscience is overcome by force or punishment meted out for the refusal to betray it." 902 F.2d at 726. In *In re A–G–*, the BIA did not limit conscientious objector status to those who refuse to be conscripted into the military because of dictates of conscience, but extended the concept of conscientious objection to include those who, after submitting to mandatory conscription, are placed in a position that requires them to betray their conscience by engaging in inhuman conduct and refuse to engage in such conduct.

> Exceptions to [the rule that forced recruitment into the military is not persecution] may be recognized in those rare cases where a disproportionately severe punishment would result on account of one of the five grounds enumerated in [8 U.S.C. § 1101(a)(42)(A), i.e., race, religion, nationality, membership in a particular social group, or political opinion], or where the alien would necessarily be required to engage in inhuman conduct as a result of military service required by the government.

Slip op. at 6. In deciding Barraza's appeal, the BIA agreed that, for purposes of establishing asylum eligibility, persecution can result from a conscriptee's desertion to avoid military orders requiring inhuman conduct.

There is ample support for the conclusion that persecution can result from resisting conscription for reasons of conscience or refusing to comply with military orders after induction because they violate standards of human decency. Both *Canas–Segovia* and *In re A–G–* rely on the Office of the United Nations Commissioner for Refugees' *Handbook on Procedures and Criteria for Determining Refugee Status* (1979) ("Handbook").[10] According to paragraph 167 of the Handbook, punishment for desertion or draft evasion, in itself, does not constitute persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. But disproportionately severe punishment on account of any of these factors does constitute persecution. *Id.* at para. 169; *accord Canas–Segovia v. INS*, 902 F.2d at 723–26. Most important for our purposes, the Handbook also advises that an alien may qualify for refugee status after either desertion or draft evasion if he or she can show that military service would have required the alien to engage in acts "contrary to basic rules of human conduct." *Id.* at paras. 170, 171.

The Immigration and Nationality Act does not specifically list persecution on account of "conscientious objection" as grounds for asylum eligibility. The Supreme Court, however, has broadly defined "religion" in traditional conscientious objector cases.

> What is necessary ... for a registrant's conscientious objection to all war to be "religious" ... is that this opposition to war stems from the registrant's moral, ethical, or religious beliefs about what is right and wrong and that these beliefs be held with the strength of traditional religious convictions.... If an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual "a place parallel to that filled by ... God" in traditionally religious persons.

*Welsh v. United States*, 398 U.S. 333, 339–40, 90 S.Ct. 1792, 1796–97, 26 L.Ed.2d 308 (1970) (quoting *United States v. Seeger*, 380 U.S. 163, 176, 85 S.Ct. 850, 859, 13 L.Ed.2d 733 (1965)); *see also United States v. Stock*, 460 F.2d 480, 483 (9th Cir.1972) (noting that "*Welsh* and *Seeger* stress that conscientious objector status ... is not dependent upon membership in a particular religion or organized church"); Ingber, *Religion or Ideology: A Needed Clarification of the Religion Clauses*, 41 Stan.L. Rev. 233, 258–64 (1989) (discussing *Seeger*, *Welsh*, and "[t]he transformation of religion from a theistic conception to a sincere and meaningfully held belief system"). Viewed in light of these authorities, refusal to engage in inhuman acts of

10. We consult the Handbook for "assistance in understanding many concepts related to our immigration laws." *Hernandez–Ortiz v. INS*, 777 F.2d at 514 n. 3.

violence out of a sincere, strongly held belief that the acts are wrong may be viewed as a result of "moral, ethical, or religious belief about what is right and what is wrong," *Welsh v. United States,* 398 U.S. at 340, 90 S.Ct. at 1796, and is tantamount to religious objection to participation in the acts. The Board's rulings that persecution based on refusal to participate in inhuman acts may be grounds for political asylum and our court's broad definition of conscientious objection in the asylum context are thus consistent with the terms of the Immigration and Nationality Act.

In deciding Barraza's case, the BIA held that "a claim to conscientious objector status should be sustained and refugee status granted if an individual establishes that he will be forced to participate in activities which are contrary to the basic rules of human conduct." The Board, however, found that: (1) Barraza was not actually threatened by Lieutenant Calbo, the military officer who ordered him to participate in the assassinations; (2) Lieutenant Calbo was dead; and (3) Barraza failed to establish that the murders were sanctioned by the Salvadoran government or military. The BIA concluded that Barraza failed to establish a well-founded fear that if returned to El Salvador he would be forced, through military service, to participate in unconscionable acts, or would be punished for refusing to participate in the acts.

Assuming, as we must, that Barraza's testimony was credible, we cannot doubt that Barraza satisfied the subjective component of the "well-founded fear" standard. He testified that he opposed participating in paid assassinations because he believed they were wrong and illegal, and that he feared being forced to participate in the murders or being killed for refusing to participate. We conclude, based on the record before us, that Barraza has shown "genuine fear." *See Diaz-Escobar v. INS,* 782 F.2d at 1492.[11]

The issue, then, is whether substantial evidence supports the BIA's conclusion that Barraza did not show a reasonable possibility that the persecution he feared would occur if he was returned to El Salvador. We hold that the BIA's conclusion is not supported by substantial evidence.

The BIA's findings that Barraza was never threatened and that the military officer who threatened Barraza was dead are not supported by substantial evidence. The BIA explained:

> [T]he respondent states ... that he would be killed by the lieutenant if he failed to take the action. The transcript indicates that the respondent was told that if he did not kill the intended victims ..., they would kill him.

This is a strained reading of the transcript, which states in relevant part:

> A: There was a lieutenant that told me to come over here.
>
> Q: What was his name?
>
> A: They called him Calbo, Lieutenant Calbo.
>
> Q: Calbo?
>
> A: And he said prepare yourself when you return, because we have a commission. We're going to take two men to ... assassinate. And then I said why, it's an order he said, *because they have paid me and I need the money. And then he said, what do you prefer, that they kill you or kill them?*

(Emphasis added.) When taken in context, the meaning of the exchange is clear: the lieutenant told Barraza that either Barraza helped kill the two men or whoever had hired the lieutenant to do the job would have Barraza killed.[12] Under the circum-

11. The BIA's finding that Barraza returned to El Salvador for Christmas in 1985, and that this undermines Barraza's claim of genuine fear, is wrong. Barraza testified that he *wanted* to go home for Christmas in December 1985 to see his parents and children, but that his parents warned him not to come because of anonymous threats. He did *not* testify that he returned to El Salvador. That Barraza wanted to see his family was natural; that he *still* did not return to El Salvador supports, rather than undermines, his claim of genuine fear.

12. Interpreting Lieutenant Calbo's words as telling Barraza that the *victims* would kill him if Barraza did not kill them makes no sense. Nothing in the record indicates that Barraza

stances, Barraza could reasonably expect that, in either case, Lieutenant Calbo would be involved in the killing.

Further, Barraza's testimony does not show that Lieutenant Calbo was dead or that Barraza believed he was dead. Barraza was asked by the immigration judge whether he knew where Lieutenant Calbo was. Barraza responded: "I don't know. They told me that he had died. I don't know." The immigration judge followed up the question, and Barraza responded: "One friend told me that they weren't sure, but that they went to a fight and when they returned to the headquarters he wasn't with them." Barraza clearly stated that he *did not know* where Lieutenant Calbo was; he did not even imply that he believed Lieutenant Calbo was dead. There is no other indication on the record that Lieutenant Calbo was dead or that Barraza believed he was dead.[13]

Nor does substantial evidence support the BIA's determination that Barraza failed to establish that Lieutenant Calbo's order was sanctioned by the Salvadoran military or government.[14] The Board found that "[t]here is no evidence in the record that the respondent questioned officers further up the chain of command regarding the 'commission.'" As a matter of common sense, this cannot sustain the BIA's determination, for the greater the involvement of the military in the "commission," or assassinations, the less likely Barraza would be to appeal the order up the chain of command. In fact, Barraza gave specific evidence of military involvement. He testified that the order was made by a uniformed Salvadoran military officer at headquarters while the entire unit was in formation. Lieutenant Calbo's actions involved the exercise of military authority. Barraza corroborated this testimony with an article detailing the practice of military officers ordering assassinations and an Amnesty International report describing joint military-death squad operations.

The record before us indicates that a Salvadoran military official gave Barraza a terrifying choice: to murder others, or to be murdered himself. A specific, serious threat may establish a well-founded fear of persecution, *Bolanos-Hernandez v. INS*, 767 F.2d at 1285; *Arteaga v. INS*, 836 F.2d at 1232, and punishment based on objection to participation in inhuman acts as part of forced military service is "persecution" within the meaning of 8 U.S.C. § 1101(a)(42)(A), *see Canas-Segovia v. INS*, 902 F.2d at 726; *In re A-G-*, slip op.

knew the intended victims' identities or that the victims knew Barraza's identity. It is highly unlikely that Barraza—or Lieutenant Calbo and his sponsors—would inform the victims that Barraza had refused to assassinate them. It is even less likely that, given news of Barraza's identity and refusal, the intended victims would want to kill Barraza. On the other hand, Lieutenant Calbo and his sponsors knew who and where Barraza was, and would have clear motive to kill Barraza.

13. Even if Lieutenant Calbo were dead, his death would not not necessarily defeat Barraza's claim. According to Lieutenant Calbo, "they" would kill Barraza if he did not participate in the assassination. There is no evidence in the record that "they" are dead. "[W]hen a member of a group which engages in violence makes a threat, and there is no evidence that the member has only personal motives for making the threat, the reasonable inference is that the *group* is responsible for the threat...." *Elias Zacarias v. INS*, 908 F.2d 1452, 1457 (9th Cir.1990). Lieutenant Calbo was one of several, and even if he were dead, the group could kill Barraza.

14. We encounter here a different situation than that addressed recently by the Fourth Circuit in a conscientious objector case, *M.A. v. INS*, 899 F.2d at 304. In that case, a Salvadoran man who had never served in the military fled El Salvador because he wished "'to avoid serving in [the] violent military.'" *Id.* at 306. The BIA denied the petitioner's motion to reopen on the ground that he failed to show that, as a matter of government policy, the Salvadoran military routinely engaged in unconscionable acts condemned by the international community. *Id.* at 312. The Fourth Circuit upheld the Board's order. *Id.* at 312–14. In contrast to the petitioner in *M.A. v. INS*, here Barraza does not claim *general* opposition to military service based on institutionalized practices of the Salvadoran military. He was *actually threatened*—a Salvadoran military official ordered him to participate in two murders, internationally condemned inhuman acts. *See* Geneva Conventions, Aug. 12, 1949, art. 3, T.I.A.S. Nos. 3362–3365, at 4–7, 75 U.N.T.S. 31. *M.A. v. INS* is, therefore, inapposite, and we express no opinion on the Fourth Circuit's treatment of the more general conscientious objector claim at issue in that case.

at 6; Handbook at paras. 169–71. Barraza established a genuine and objectively reasonable fear that, if returned to El Salvador, he would be killed for refusing to participate in the inhuman act of paid assassination ordered by a Salvadoran military officer. In these circumstances, Barraza has demonstrated a well-founded fear of persecution, and is eligible for political asylum.

■ While we conclude that Barraza has shown a well-founded fear of persecution based on his refusal to participate in the murders, we hold that the BIA was substantially reasonable in finding that Barraza failed to show a "clear probability" of persecution necessary to obtain withholding of deportation and, therefore, correctly denied his withholding of deportation claim. Barraza, according to the BIA's findings, did not show that it was "more likely than not" or probable that he would be forced to participate in unconscionable assassinations or would be killed for refusing to do so. The evidence of the threat from Lieutenant Calbo supports Barraza's claim of a well-founded fear of persecution, i.e., that there is a reasonable possibility of persecution. But we cannot say that the BIA committed error in finding that this evidence does not rise to the degree of probability of persecution held to be sufficient for section 243(h) relief in other cases. See Garcia–Ramos v. INS, 775 F.2d 1370, 1373 (9th Cir.1985); Arteaga v. INS, 836 F.2d at 1231 n. 6.

### CONCLUSION

The petition is granted. The BIA's decision that Barraza was ineligible for political asylum is not supported by substantial evidence. Because the Board expressly avoided the credibility question, we remand the case to the BIA for credibility findings. See Damaize–Job v. INS, 787 F.2d 1332, 1338 (9th Cir.1986); Canjura–Flores v. INS, 784 F.2d 885, 889 (9th Cir.1985). If the BIA accepts Barraza's testimony as credible, then the BIA shall exercise its discretion under § 208 of the Immigration and Nationality Act.

REVERSED and REMANDED.