**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18–2469**

HECTOR DANIEL LOPEZ ORDONEZ, a/k/a Hector Lopez Ordonez,

Petitioner,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: January 28, 2020                              Decided: April 16, 2020

Before GREGORY, Chief Judge, WILKINSON, and WYNN, Circuit Judges.

Petition for review granted; vacated and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Wilkinson and Judge Wynn joined.

**ARGUED:** Samuel Batiste Hartzell, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Petitioner. John Beadle Holt, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Ripley E. Rand, Rebecca C. Fleishman, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Petitioner. Joseph H. Hunt, Assistant Attorney General, Claire L. Workman, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

GREGORY, Chief Judge:

Hector Daniel Lopez Ordonez was conscripted into the Guatemalan military when he was 15 years old. As part of the G-2 intelligence unit, Lopez Ordonez was ordered—and repeatedly refused—to torture and kill people. After a particularly horrific incident in which Lopez Ordonez refused to murder a five-month-old baby and threatened to report the G-2's abuses to human rights organizations, the G-2 confined him to a hole in the ground for ten months. Upon his release, he fled to the United States.

Lopez Ordonez now petitions this Court to review an order from the Board of Immigration Appeals ("BIA") denying his asylum application and ordering his removal to Guatemala. The BIA determined that Lopez Ordonez did not meet the nexus requirement to establish his eligibility for asylum—that is, he did not show past persecution on account of a statutorily protected ground. The record in this case, however, compels us to conclude that Lopez Ordonez has demonstrated that one central reason for his persecution by the Guatemalan military was his political opinion, a protected ground under the Immigration and Nationality Act ("INA"). Accordingly, we vacate the BIA's nexus determination and remand for further proceedings.

I.

A.

Lopez Ordonez was born in Guatemala in 1964. In 1979, when he was 15 years old, he was forced to join the Guatemalan military. For his first six months in the military, he worked in an automotive shop and learned to drive equipment. After that, he was moved

2

to the G-2 intelligence unit, where he served as a driver for the unit's missions. At the time, Guatemala was engaged in a decades-long civil war in which the government targeted and attempted to eliminate left-wing guerillas. The G-2's missions included abducting, torturing, and murdering alleged criminals and guerilla members, as well as children and those the G-2 simply "didn't like." J.A. 197.

As a driver for the G-2, Lopez Ordonez transported prisoners for detention or interrogation. He also had to blindfold and bind the hands of captured individuals. After interrogation, these individuals would either be released, jailed, or killed. Lopez Ordonez did not participate in interrogations or killings, but he was ordered to carry away dead bodies in his truck. The G-2 threatened to kill him and his family if he refused to obey these orders or defected, making him afraid to leave despite receiving discharge papers in 1985. The G-2 also beat him and held a gun to his head to ensure his compliance.

Lopez Ordonez, however, would not kill anyone for the G-2. The unit instructed him to kill on numerous occasions and he repeatedly refused, telling the G-2, "I was not going to do it for the simple fact that at home I was taught Christian[] beliefs. And due to my Christian principles, I would never do something like that." J.A. 173. When he refused to torture or murder other people, G-2 soldiers "tortured and beat" him. J.A. 286.

In 1996, the G-2 confronted guerilla members in a mountain village, capturing and decapitating men, women, and children. During the confrontation, G-2 soldiers ordered Lopez Ordonez to murder a five-month-old baby. He refused, telling the soldiers he "would never do that" and "would rather get killed." J.A. 241. In response, they beat Lopez Ordonez. Then, one soldier "grabbed the baby[] by his feet and tried to hit [Lopez

3

Ordonez] with . . . the baby." *Id.* Upon seeing this, Lopez Ordonez threatened the soldier that if he did "anything," Lopez Ordonez would "call the human rights right now." *Id.* The soldier then hit Lopez Ordonez in the head with the baby, resulting in a "huge collision" that left a scar on Lopez Ordonez's forehead, which is still visible today. *Id.* The soldiers ultimately killed the baby by slamming the baby repeatedly into Lopez Ordonez. He fell to the ground, and they placed the baby on top of him. He expected to be killed for his resistance, but the soldiers instead kicked him repeatedly while he was on the ground.

Lopez Ordonez testified, "When we got back to the barracks, they told my boss that I had refused to kill a baby, and that I had threatened them that I was going to accuse them with the human rights people. So, they put me inside of that hole for ten months." *Id.* The G-2 tossed food into the hole, where it fell into Lopez Ordonez's own excrement, which he was forced to ingest. During his confinement, the G-2 would occasionally pull him out of the hole, beat him, and "tell [him] that [he has] to call human rights" to help him. J.A. 292; *see also* J.A. 63 ("[C]all your human rights so they can defend you. . . . Where are your human rights[?]").

After ten months, Lopez Ordonez was released from the hole. He defected from the military and told his mother that he had to flee the country because he knew too much about the G-2's inside operations. After Lopez Ordonez entered the United States in 1997, his mother reported through third parties that individuals—whom Lopez Ordonez believed to be G-2 soldiers—came to her house almost every night, held a gun to her head, and demanded to know Lopez Ordonez's whereabouts. A couple of years later, individuals took his brother from his mother's house, tied him up, and blindfolded him. His brother,

4

who had the same name as Lopez Ordonez, "turned up dead somewhere in the city." J.A. 270. Soon after, his mother sold her house and family members dispersed.

Lopez Ordonez was afraid to return to Guatemala because he believed he would be killed for knowing too much about the military's operations. He also feared the people he detained while he was with the G-2, or their family members, would harm him.

B.

Lopez Ordonez entered removal proceedings in 2014. He conceded removability but applied for asylum and withholding of removal based on religion, political opinion, and membership in a particular social group.[1] He also sought protection under the Convention Against Torture ("CAT"). Lopez Ordonez testified in support of his applications before an Immigration Judge ("IJ") in February and March 2018. The IJ found Lopez Ordonez's testimony "plausible and internally consistent." J.A. 68. "[N]othing in [his] demeanor suggested that he was being evasive or in any way trying to obscure the truth." *Id.* Accordingly, the IJ found Lopez Ordonez "credible." *Id.*

Nevertheless, on June 21, 2018, the IJ issued a decision denying all relief and ordering Lopez Ordonez's removal. Lopez Ordonez had conceded that his asylum application was untimely because he did not file it within one year of entry to the United States. Accordingly, the IJ addressed only withholding of removal and CAT protection.

To qualify for withholding of removal, a petitioner must face a clear probability of persecution in the country of removal on account of his race, religion, nationality,

---

[1] Because Lopez Ordonez does not raise the issue of his membership in a particular social group on appeal, we will not address it in this opinion.

membership in a particular social group, or political opinion. *Salgado-Sosa v. Sessions*, 882 F.3d 451, 455 (4th Cir. 2018). The IJ noted Lopez Ordonez sought withholding based on "two protected grounds: (1) his Christian religion; and (2) his imputed political opinion due to his unwillingness to obey military orders." J.A. 68. The IJ first rejected the argument that Lopez Ordonez suffered past persecution on account of his religion because Guatemalan military officials did not harm him "to overcome or punish him for his religious beliefs;" instead, "the central reason that military officials harmed [him] stemmed from his refusal to obey orders."[2] J.A. 69. The IJ also found no past persecution on account of a political opinion because Lopez Ordonez "submitted insufficient evidence . . . that the military officials would have seen his actions as political in nature," especially given his long tenure in the military. *Id.* He "did not testify that he was a member of a political party, or that he ever expressed anti-military opinions in a political forum." *Id.*

Because the IJ did not find past persecution on account of a protected ground, the IJ did not apply a presumption of future persecution. Instead, the IJ assessed whether Lopez Ordonez independently showed that future persecution was more likely than not. The IJ determined that Lopez Ordonez did not establish a clear probability of future persecution as a "former soldier[] who disobeyed orders because of [his] Christian religion and [was] persecuted because of it." J.A. 70. Finding Lopez Ordonez established neither past persecution nor a clear probability of future persecution on account of a protected ground, the IJ denied his application for withholding of removal.

---

[2] The correct standard is "at least *one* central reason," not "*the* central reason." *Salgado-Sosa*, 882 F.3d at 455 (emphasis added).

As for protection under the CAT, a petitioner must show it is more likely than not that he will be tortured in his home country with the consent or acquiescence of the government. *Salgado-Sosa*, 882 F.3d at 456. The IJ found Lopez Ordonez failed to establish "that the current Guatemalan government or military or family members impacted by the civil war [would] seek to physically harm former military leaders and soldiers," like Lopez Ordonez. J.A. 72. Because he did not establish that he would be tortured—if at all—by or with the acquiescence of the Guatemalan government, the IJ denied him CAT relief. Lopez Ordonez appealed the IJ's decision to the BIA.

C.

A one-member panel of the BIA issued a decision affirming the IJ's findings and dismissing Lopez Ordonez's appeal. The BIA, however, considered his asylum claim because he was a class member to an agreement requiring the government to treat certain pending asylum applications as though they were filed within the one-year deadline.

Both asylum and withholding of removal are based on a showing of persecution on account of a statutorily protected ground. *Salgado-Sosa*, 882 F.3d at 456. The BIA agreed with the IJ's determination that religion was not "a central reason for the harm [Lopez Ordonez] suffered." J.A. 2. Instead, military officials harmed him for refusing to obey orders. The BIA also agreed that Lopez Ordonez "was not a member of a political group" and that "he did not ever express anti-military opinions." J.A. 3. Nor did Lopez Ordonez "show that the military officials interpreted his actions as political in nature." *Id.* Because he was not entitled to a rebuttable presumption of a well-founded fear of future persecution and did not have an independent claim for such a fear, he was not eligible for asylum or

7

withholding of removal. The BIA also found "no reason to disturb the [IJ's] well-reasoned determination that [Lopez Ordonez] did not meet his burden to demonstrate his eligibility for protection under the [CAT]." J.A. 4.

Lopez Ordonez timely petitioned this Court for review of the BIA's decision.

## II.

"When, as here, the BIA affirms the IJ's decision with an opinion of its own, we review both decisions." *Salgado-Sosa*, 882 F.3d at 456. We review factual findings for substantial evidence and they are conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* A persecutor's motives—at issue here—are "a classic factual question." *Crespin-Valladares v. Holder*, 632 F.3d 117, 127–28 (4th Cir. 2011). We review legal determinations de novo. *Id.* at 124.

The requirements for asylum and withholding of removal under the INA are similar. A petitioner requesting either form of relief must establish persecution "on account of" a statutorily protected ground, including race, religion, nationality, political opinion, or membership in a particular social group. *Salgado-Sosa*, 882 F.3d at 456. The petitioner can establish eligibility in two ways. *Tairou v. Whitaker*, 909 F.3d 702, 707 (4th Cir. 2018). First, he may show that he was subjected to past persecution, which entitles him to a rebuttable presumption of a well-founded fear of future persecution. *Id.* Second, he may show a well-founded fear of future persecution. *Id.*

Although these forms of relief are similar, asylum is discretionary and withholding is mandatory. *Salgado-Sosa*, 882 F.3d at 456. As a result, withholding requires a higher

8

standard of proof—a "clear probability" of persecution—while asylum requires a "well-founded fear" of persecution. *Id.* Both, however, share a core requirement: a nexus between the persecution and a protected ground under the INA. *Id.* at 456–57.

To establish the requisite nexus, a petitioner must demonstrate that the protected ground "was or will be a central reason for [his] persecution." *Alvarez Lagos v. Barr*, 927 F.3d 236, 250 (4th Cir. 2019). "The protected ground need not be the only reason—or even the dominant or primary reason—for the persecution." *Id.* Instead, "it is enough that the protected ground be *at least one* central reason for the persecution." *Id.* (internal quotation marks and citation omitted). This reason may be "intertwined" with other reasons that the petitioner, rather than another person, was persecuted. *Id.* The protected ground, however, cannot be merely an "incidental, tangential, superficial, or subordinate" reason for the persecution. *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164 (4th Cir. 2009). Finally, while a petitioner need not supply a "smoking gun," *Ilunga v. Holder*, 777 F.3d 199, 213 (4th Cir. 2015), "he must provide *some* evidence of [his persecutors' motive], direct or circumstantial." *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992).

## III.

There is no dispute in this case that Lopez Ordonez suffered horrific past persecution.[3] Instead, the critical question is whether he established the requisite nexus

---

[3] "Persecution takes the form of threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Singh v. Holder*, 699 F.3d 321, 332 (4th Cir. 2012) (internal quotation marks and citation omitted).

between his past persecution and a protected ground. We find the BIA erred in determining that Lopez Ordonez did not establish a nexus between his persecution and political opinion.[4] Lopez Ordonez showed that the G-2, a division of the Guatemalan military, imputed a political opinion to him based on his opposition to its inhuman conduct and his threats to report that conduct to human rights organizations. Critically, he also demonstrated that the G-2 persecuted him on account of that imputed political opinion.

A political opinion may be actually held by a petitioner or imputed to him by his persecutors. *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 450 (4th Cir. 2007). In the latter case, as here, the petitioner bears the burden of showing that "his persecutors actually imputed a political opinion to him." *Id.* at 450–51. "[T]he relevant inquiry is not the political views sincerely held or expressed by the victim, but rather the persecutor's subjective perception of the victim's views." *Alvarez Lagos*, 927 F.3d at 254.

As Lopez Ordonez recognizes, forced military recruitment alone does not amount to persecution on account of a political opinion. *See Elias-Zacarias*, 502 U.S. at 482. Indeed, a government has "the right to enforce its laws of conscription," and "penalties for evasion are not considered persecution." *M.A. v. INS*, 899 F.2d 304, 312 (4th Cir. 1990)

---

[4] Because we find persecution on account of a political opinion, we do not reach Lopez Ordonez's argument that he was persecuted because of his religion. Furthermore, we do not credit the government's claim that Lopez Ordonez failed to administratively exhaust his political opinion argument. *See Ramirez v. Sessions*, 887 F.3d 693, 700 (4th Cir. 2018) (noting we may only review a removal order if the petitioner has exhausted his administrative remedies). That Lopez Ordonez makes "more specific and nuanced points" on appeal does not mean he failed to exhaust the broader argument. *See id.* (observing we are precluded from considering "bases for relief that were not raised below," but not from considering "specific, subsidiary legal arguments, or arguments by extension, that were not made below").

(en banc), *superseded by statute on other grounds*. The situation is different, however, when a petitioner is forced to serve in "a military whose acts are condemned by the international community as contrary to the basic rules of human conduct." *Id.* "There is ample support for the conclusion that persecution can result from . . . refusing to comply with military orders after induction because they violate standards of human decency." *Barraza Rivera v. INS*, 913 F.2d 1443, 1451 (9th Cir. 1990). In other words, "conscientious objection to military service," can serve as grounds for relief where a petitioner "would be required to engage in inhuman conduct were he to continue serving in the military." *Ramos-Vasquez v. INS*, 57 F.3d 857, 863 (9th Cir. 1995).

The record in this case indicates that the G-2 imputed to Lopez Ordonez a political opinion in opposition to military acts "condemned by the international community as contrary to the basic rules of human conduct." *M.A.*, 899 F.2d at 312; *see also Barraza Rivera*, 913 F.2d at 1450–51 (noting persecution can be found where a petitioner objects "to being forced to perform inhuman acts under military orders"). When G-2 soldiers ordered Lopez Ordonez to kill an infant, he refused and threatened to report them to human rights organizations. As a result, they beat him with the infant until the infant died—horrific conduct that "violate[s] standards of human decency" by any measure. *Barraza Rivera*, 913 F.2d at 1451.

The soldiers then reported to their superiors that Lopez Ordonez threatened to "accuse them with the human rights people." J.A. 241. Upon hearing this, the G-2 confined him to a hole in the ground for ten months. Additionally, during Lopez Ordonez's confinement, G-2 soldiers taunted him with his threat, telling him "to call human rights"

11

to protect him, and asking, "where are your human rights?" J.A. 63, 292. These circumstances demonstrate that the G-2 imputed a political belief to Lopez Ordonez—one that entailed opposition to and a threat to report the military's human rights abuses.

Having established that the G-2 imputed a political opinion to Lopez Ordonez, we turn to whether he showed the requisite nexus between his persecution and that political opinion. Lopez Ordonez had refused to comply with orders to kill on numerous occasions in the past and was severely beaten for his refusal. But it was only after this particular incident that he was beaten with an infant—an inhuman act of persecution itself—and confined to a hole in the ground. *See* J.A. 197 (Lopez Ordonez testifying that when he threatened to talk to "the human rights people" was "when [he] started to suffer"). In this instance, Lopez Ordonez's opposition to the G-2 changed and intensified; not only did he refuse to comply with orders to kill the baby, but he also threatened to expose the Guatemalan military for murdering children. *See Barraza Rivera*, 913 F.2d at 1450 (finding a petitioner eligible for political asylum "based on his objection to participating in . . . murders under orders from a Salvadoran military officer").

The "timing" of the persecution in this case "is key." *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 249 (4th Cir. 2017). Immediately after G-2 soldiers told their superiors that Lopez Ordonez had threatened to report them to human rights organizations, the G-2 confined Lopez Ordonez to a hole in the ground. G-2 members periodically removed him from the hole and told him to call human rights groups for help, which serves as direct evidence that they were punishing him "on account of" his threat. *Salgado-Sosa*, 882 F.3d at 456. These facts lead to the conclusion that Lopez Ordonez's imputed political

12

opinion—his opposition to the G-2's human rights abuses—was a central reason for his persecution.

As Lopez Ordonez concedes, his failure to follow orders may have been one reason for his punishment. But multiple reasons for persecution can be intertwined; the protected ground need only be one central reason—and not even the dominant reason—for the persecution. *Alvarez Lagos*, 927 F.3d at 250. Although Lopez Ordonez had been beaten for refusing to obey orders to torture and kill in the past, his threats to report the Guatemalan military for killing children showed a concrete escalation in his opposition to the G-2's activities. This caused a corresponding escalation in the G-2's response, which cannot be ignored when determining whether he met the nexus requirement.[5] Accordingly, the political opinion the G-2 imputed to Lopez Ordonez was not merely incidental or tangential to any other reason for his punishment—indeed, the evidence shows the opinion motivated the G-2 to persecute him in an unprecedented and atrocious way.

Essential to the foregoing analysis is the IJ's finding that Lopez Ordonez was credible, a finding the BIA did not disturb. *See Oliva*, 807 F.3d at 56 n.1 (noting a petitioner's credible testimony alone can satisfy his burden of proof, even without corroboration). Lopez Ordonez "credibly testified" that he refused to "engag[e] in inhuman conduct," including murdering an infant. *See Ramos-Vasquez*, 57 F.3d at 864. He also credibly testified that he threatened to expose the G-2's human rights abuses, his threats

---

[5] The record indicates that the G-2 was concerned about being exposed, as they had previously instructed Lopez Ordonez "not to say anything to anybody" about their operations, under threat of death. J.A. 195.

13

were reported to military superiors, and, as a result, he was confined to a hole in the ground for ten months. And he credibly testified that while he was in the hole, G-2 soldiers mocked him with his own words—telling him to call human rights groups to defend him. The IJ and BIA were not free to disregard "key parts of [this] credible testimony." *See Ruqiang Yu v. Holder*, 693 F.3d 294, 299 (2d Cir. 2012) (remanding to the BIA for failure to "meaningfully engage with the record").

Accordingly, the evidence in this case—which largely consists of Lopez Ordonez's own credible testimony—compels the conclusion that Lopez Ordonez has established the requisite nexus between his undisputed past persecution and imputed political opinion.


IV.

In sum, we conclude that Lopez Ordonez established that the past persecution he suffered at the hands of the Guatemalan military was on account of a statutorily protected ground: his imputed political opinion. We therefore grant Lopez Ordonez's petition for review, vacate the BIA's determination that he did not establish the requisite nexus between past persecution and a protected ground, and remand to the BIA for further proceedings consistent with this opinion.[6]


*PETITION FOR REVIEW GRANTED; VACATED AND REMANDED*

---

[6] We do not reach whether Lopez Ordonez met his burden for CAT relief by demonstrating it is more likely than not that he would be tortured with the acquiescence of the Guatemalan government. On remand, if the BIA declines to grant asylum or withholding of removal, it should reconsider Lopez Ordonez's CAT claim in a manner consistent with this opinion.

14