**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1594**

REYNALDO SALGADO-SOSA,

Petitioner,

v.

JEFFERSON B. SESSIONS III, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: October 24, 2017                          Decided: February 13, 2018

Before GREGORY, Chief Judge, and FLOYD and HARRIS, Circuit Judges.

Petition for review granted in part, denied in part, and remanded for further proceedings by published opinion. Judge Harris wrote the opinion, in which Chief Judge Gregory and Judge Floyd joined.

**ARGUED:** Alfred Lincoln Robertson, Jr., ROBERTSON LAW OFFICE, PLLC, Alexandria, Virginia, for Petitioner. Anthony W. Norwood, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Leslie McKay, Senior Litigation Counsel, Siu P. Wong, Trial Attorney, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

PAMELA HARRIS, Circuit Judge:

Reynaldo Salgado-Sosa, a native and citizen of Honduras, seeks asylum, withholding of removal, and protection under the Convention Against Torture. If he is returned to Honduras, he fears, he will face persecution at the hands of the gang MS-13, which has repeatedly attacked his family for resisting extortion demands.

The agency proceedings focused on whether Salgado-Sosa could show, for purposes of both his asylum and withholding of removal claims, a nexus between MS-13's threats and membership in a cognizable "particular social group" – here, Salgado-Sosa's family. The Board of Immigration Appeals found that Salgado-Sosa could not establish the requisite nexus, and denied withholding of removal on that ground. The Board separately found that Salgado-Sosa's asylum application was untimely, and that there was insufficient evidence to justify protection under the Convention Against Torture.

We conclude that the Board erred in holding that Salgado-Sosa did not meet the nexus requirement. The record compels the conclusion that at least one central reason for Salgado-Sosa's persecution is membership in his family, a protected social group under the Immigration and Nationality Act. Accordingly, we vacate the denial of withholding of removal, and remand for further proceedings on that claim. On the asylum claim, we separately remand for consideration of whether our recent decision in *Zambrano v. Sessions*, 878 F.3d 84 (4th Cir. 2017), affects Salgado-Sosa's argument that a statutory "changed circumstances" exception allows consideration of his untimely application.

2

## I.

In August 2005, Salgado-Sosa entered the United States without authorization and began living with his uncle in Sterling, Virginia. In September 2010, the Department of Homeland Security served him with a notice to appear, charging him as an alien who had not been admitted or paroled in violation of section 212(a)(6)(A)(i) of the INA. Salgado-Sosa conceded removability, but applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").

At his removal hearing, Salgado-Sosa and his stepfather, Humberto Merez-Merlo, testified before the Immigration Judge ("IJ") and submitted affidavits, an expert declaration, and other documentary evidence for the court's consideration. We begin by summarizing the testimony and evidence and then outline the legal proceedings that followed.

## A.

Salgado-Sosa and his extended family were operating a small convenience store and automobile repair shop out of their family home in Tegucigalpa, Honduras, when armed members of the gang Mara Salvatrucha, known as "MS-13," began to threaten and harass them for a "war tax" in exchange for protection. Merez-Merlo, Salgado-Sosa's stepfather, refused to pay the gang and instead paid the local police to drive by their home every few hours.

In November 2002, five armed members of MS-13 broke into the family home and held Salgado-Sosa's parents at gunpoint. After the family attempted to fight back, MS-13 opened fire, missing Salgado-Sosa but shooting his stepfather twice. Salgado-Sosa

and Merez-Merlo reported the incident to the police and later testified against several members of MS-13 at a preliminary criminal proceeding. Although at least one gang member was temporarily detained, all of the suspects were eventually released.

Shortly after the first attack, MS-13 broke into Salgado-Sosa's auto shop and stole his tools, forcing him to shut down his business. Some weeks later, when Merez-Merlo returned from the hospital, MS-13 attacked for a third time, firing on the family home from the street. Salgado-Sosa's family fired back, and suspect that they injured at least one member of MS-13 during the shootout.

Fearing reprisals, the family fled to Salgado-Sosa's grandparents' home in El Rosario, a nearby town, where they remained in hiding for approximately one year. After learning that MS-13 was gathering information on their whereabouts and planned "to kill whoever [they] were with," the family moved again, hoping to keep Salgado-Sosa's grandparents out of harm's way. J.A. 205.

Now in a different part of Tegucigalpa, Salgado-Sosa learned from his former neighbors that MS-13 was still searching for his family. In 2004, Salgado-Sosa's vehicle was hit from behind, resulting in an accident that caused him severe injuries. Although there were no witnesses, his family suspects that MS-13 was involved. That same year, Merez-Merlo was robbed and assaulted by someone he recognized as a member of MS-13.

In 2005, Salgado-Sosa's parents helped him escape to the United States. After living in Virginia and Maryland for five years, Salgado-Sosa was detained by ICE when his name appeared on an Interpol alert for car theft in Honduras – charges that were later

4

dropped. Salgado-Sosa's family suspects that corrupt police may have been involved in filing those charges to cause his deportation.

At the removal hearing, Salgado-Sosa testified to and presented evidence regarding the events that led to his flight from Honduras and to the United States. Noting his family's warnings that MS-13 continues to ask about his whereabouts, he confirmed that he remains in fear of returning to Honduras. Along with other evidence of country conditions in Honduras, Salgado-Sosa submitted a declaration from Dr. Thomas J. Boerman, an expert on organized crime in Honduras. Dr. Boerman opined that based on an interview with Salgado-Sosa, his review of the evidence in this case, his knowledge of how MS-13 operates, and the deteriorating conditions in Honduras after a 2009 coup, Salgado-Sosa would be "at high risk of egregious physical harm and death if returned to Honduras." J.A. 368.

**B.**

After considering the evidence and hearing Salgado-Sosa's testimony, the IJ found Salgado-Sosa generally credible, noting his demeanor and the consistency of his account with other information in the record. The IJ then addressed each of Salgado-Sosa's claims.

First, the IJ denied Salgado-Sosa's asylum application as untimely filed. Under the INA, aliens have one year to file for asylum after arriving in the United States. 8 U.S.C. § 1158(a)(2)(B). Salgado-Sosa, who arrived in 2005 and applied for asylum in 2011, conceded that he filed several years after the deadline. He argued, however, that he qualifies for a statutory "changed circumstances" exception, permitting consideration of a

5

late application if a petitioner can establish "the existence of changed circumstances which materially affect the applicant's eligibility for asylum." 8 U.S.C. § 1158(a)(2)(D). According to Salgado-Sosa, "conditions in Honduras have deteriorated," and his concerns for his safety have increased after the 2009 coup in that country. J.A. 126. The IJ rejected that argument, holding that because attacks by MS-13 remained the basis for Salgado-Sosa's fear of return, he had not shown a material change in circumstances.

The IJ next found that Salgado-Sosa is not entitled to withholding of removal. To qualify for withholding of removal, as the IJ explained, a petitioner must establish "a clear probability that [his] life or freedom would be threatened . . . because of" one of several protected grounds, including "race, religion, nationality, membership in a particular social group, or political opinion." *Mejia v. Sessions*, 866 F.3d 573, 579 (4th Cir. 2017) (internal quotation marks omitted) (quoting 8 U.S.C. § 1231(b)(3)(A)). Here, Salgado-Sosa argued that if he is deported to Honduras his life will be threatened because of membership in his family, a valid "particular social group" under *Crespin-Valladares v. Holder*, 632 F.3d 117, 124–26 (4th Cir. 2011).

The IJ acknowledged that under *Crespin-Valladares*, "family ties can provide the basis for a cognizable particular social group." J.A. 124. She went on to hold, however, that Salgado-Sosa failed to satisfy the "nexus" requirement of § 1231(b)(3)(A), requiring that the feared persecution be *on account of* those family ties. To meet this standard, the IJ explained, a petitioner must show that a statutorily protected ground would be "at least one central reason" for the feared persecution. J.A. 123 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). And here, the IJ concluded, "the central reasons for [Salgado-

6

Sosa's] past persecution and feared persecution are that [his step]father refused to pay extortion and as revenge on the family for fighting back against the gang." J.A. 127. Neither of those gang motivations implicates a protected ground under the INA, the IJ reasoned, and it follows that Salgado-Sosa cannot establish the necessary nexus between the threatened harm and membership in his family.

Finally, the IJ denied relief under the CAT, which requires a petitioner to show that, if removed, it is "more likely than not that he or she would be tortured" with the consent or acquiescence of the government. 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1); *see Turkson v. Holder*, 667 F.3d 523, 526 (4th Cir. 2012). Acknowledging "serious concerns about gang violence and other criminal activity in Honduras," the IJ nevertheless concluded that "on the basis of this particular record," Salgado-Sosa could not show a sufficient likelihood of torture with the consent or acquiescence of the Honduran government. J.A. 127.

A one-member panel of the Board of Immigration Appeals ("BIA" or "Board") dismissed Salgado-Sosa's appeal and affirmed the IJ's findings. The BIA agreed with the IJ that Salgado-Sosa failed to qualify for the changed circumstances exception based on the argument he had presented to the IJ. The Board noted that Salgado-Sosa was raising for the first time on appeal an additional argument: that our 2011 decision in *Crespin-Valladares*, recognizing family as a protected social group under the INA, itself constitutes a "changed circumstance" allowing consideration of a late-filed asylum application. But because that argument had not been presented to the IJ, it was not properly before the Board, and the Board declined to address it.

7

The BIA then affirmed the IJ's denial of withholding of removal, agreeing that Salgado-Sosa had failed to establish a sufficient nexus between the threatened harm and membership in his family. Echoing the IJ, the BIA focused on MS-13's apparent reasons for targeting Salgado-Sosa's stepfather and family, and found that "[e]vidence . . . that the perpetrators were motivated by financial gain or personal vendettas, in the absence of evidence to suggest other motivations, will not support a finding of persecution within the meaning of the [INA]." J.A. 5–6. Finally, the BIA found no reason to disturb the IJ's determination that Salgado-Sosa had failed to establish grounds for CAT protection.

Salgado-Sosa timely petitioned this court for review.

## II.

When, as here, the BIA affirms the IJ's decision with an opinion of its own, we review both decisions. *Ai Hua Chen v. Holder*, 742 F.3d 171, 177 (4th Cir. 2014). We review factual findings for substantial evidence, treating them as conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary," and legal determinations de novo. *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 948 (4th Cir. 2015) (quoting 8 U.S.C. § 1252(b)(4)(B)).

The primary issues on appeal involve Salgado-Sosa's applications for asylum and withholding of removal. Both asylum and withholding of removal are based on an applicant's showing of persecution, or, more specifically, persecution on account of a statutorily protected status, a list that includes "membership in a particular social group" as well as race, religion, nationality, and political opinion. *See* 8 U.S.C. § 1101(a)(42)(A)

8

(asylum); *id.* at § 1231(b)(3)(A) (withholding). There are some differences: Asylum is discretionary, whereas withholding of removal is mandatory; and correspondingly, the standard of proof for withholding of removal is higher, requiring the applicant to establish a "clear probability" of persecution, rather than the less stringent "well-founded fear" of persecution that will suffice to make out an asylum claim. *See Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir. 2010). But the core condition of eligibility – that there be a nexus between threatened persecution and a protected status – is the same.

We first address whether Salgado-Sosa meets this nexus requirement, and then whether he can qualify for the "changed circumstances" exception that would allow consideration of his late-filed asylum application.[1]

## A.

Salgado-Sosa argues that he successfully established the required nexus between persecution and a protected ground because "at least one central reason" for the harm he faces is membership in a social group consisting of his family. *See* 8 U.S.C. § 1158(b)(1)(B)(i). It is clear, as the IJ recognized, that under our decision in *Crespin-Valladares*, Salgado-Sosa's family qualifies as a "particular social group," protected for purposes of his asylum and withholding of removal claims. The only question is whether

---

[1] Salgado-Sosa also challenges the denial of protection under the CAT. Here the standard requires that an applicant show both that it is "more likely than not" that he or she will be tortured if removed to the country in question and also that this torture will occur at the hands of public officials or with the government's consent or acquiescence. *See Turkson*, 667 F.3d at 526. The determination of the IJ and Board that Salgado-Sosa could not meet that standard is supported by substantial record evidence, and we have no ground to disturb it.

Salgado-Sosa has shown the requisite nexus between his membership in his family and his persecution by MS-13, or whether, as the government argues, the IJ and Board correctly found that MS-13 is motivated by financial gain and revenge alone.[2]

For three reasons, we are "compelled to conclude," *see Hernandez-Avalos*, 784 F.3d at 948, that the IJ and the Board erred in finding that Salgado-Sosa has not shown that his kinship ties are "at least one central reason" for the harm he fears. First, the record manifestly establishes that MS-13 threatened Salgado-Sosa "on account of" his connection to his stepfather and to his family. Salgado-Sosa testified, for instance, that MS-13 attacked him because of his stepfather Merez-Merlo's conflict with the gang, not his own. Merez-Merlo similarly testified that his refusal to give MS-13 "what they wanted, which was the war tax," led the gang to repeatedly threaten to kill his wife and son. J.A. 236; *see* J.A. 234, 315–16. Other evidence also corroborates the centrality of family ties. For example, the family's long-time neighbor submitted an affidavit averring

---

[2] As before the IJ and Board, Salgado-Sosa's argument in this court emphasizes evidence that he and his family were targeted because of his stepfather's testimony against MS-13. But both on appeal and before the agency, Salgado-Sosa also has argued more generally that he fears persecution based on his membership in a "particular social[] group, as defined by *Crespin-Valladares v. Holder*, 632 F.3d 117 (4th Cir. 2011)." Appellant's Br. at 5; *see also* A.R. 101, 478–79. And our holding in *Crespin-Valladares* was not limited to family members of witnesses, but instead established that family membership itself is a "prototypical example of a [cognizable] particular social group." 632 F.3d at 125 (internal quotation marks omitted). The IJ and BIA accordingly considered not only whether Salgado-Sosa was persecuted for being a family member of a witness, but also whether he was persecuted because of his kinship ties generally. *See* A.R. 126 (finding that Salgado-Sosa "has not demonstrated" that any persecution "would be on account of a statutorily protected ground, *be that family group membership, as witnesses, or any other potential protected ground*") (emphasis added). Following that lead, we also consider whether the evidence shows that Salgado-Sosa was threatened on account of his familial ties, regardless of the role played by his stepfather's testimony.

10

that "the reason why the gang members wants [*sic*] to hurt [Salgado-Sosa]" is that he "*defended his stepfather* from the gang member[s]" when they assaulted the family. J.A. 537 (emphasis added).  And the IJ, as noted above, did not doubt the credibility of any of this evidence.

Second, that Salgado-Sosa's anticipated harm is on account of membership in his family follows from the IJ's *own* factual findings, adopted by the BIA.  The IJ herself determined that the central reasons for Salgado-Sosa's feared persecution are his *stepfather's* refusal to pay the gang and revenge on *the family* for resisting MS-13's extortion.  *See* J.A. 5–6, 126–27.  On a proper reading of the nexus requirement and our cases applying it, that finding compels the conclusion that Salgado-Sosa's kinship ties are a central reason for the harm he fears.

Our decision in *Hernandez-Avalos v. Lynch* is instructive.  There, the petitioner applied for asylum after gang members in El Salvador threatened her for refusing to allow her son to join the gang.  784 F.3d at 947.  The BIA rejected her assertion that the persecution was "on account of" familial ties, concluding that the petitioner "was not threatened because of her relationship to her son (i.e. family), but rather because she would not consent to her son engaging in a criminal activity."  *Id.* at 949.  We found this distinction "meaningless" and "unreasonable" given that "[petitioner's] relationship to her son is why *she*, and not another person, was threatened" by the gang.  *Id.* at 950 (emphasis added).  Thus, because the petitioner's "family connection to her son" was at least one of "multiple central reasons" for the gang's threats, we found the nexus requirement satisfied, and rejected the BIA's contrary determination as resting on "an

11

excessively narrow reading of the requirement that persecution be undertaken 'on account of membership in a nuclear family.'" *Id.* at 949–50.

The same logic applies here. There is no meaningful distinction between whether Salgado-Sosa was threatened because of his connection to his stepfather, and whether Salgado-Sosa was threatened because MS-13 sought revenge on him for an act committed by his stepfather. *See Hernandez-Avalos*, 784 F.3d at 950. However characterized, Salgado-Sosa's relationship to his stepfather (and to his family) is indisputably "why [he], and not another person, was threatened" by MS-13. *See id.* Thus, the IJ and BIA erred by focusing narrowly on the "immediate trigger" for MS-13's assaults – greed or revenge – at the expense of Salgado-Sosa's relationship to his stepfather and family, which were the very relationships that prompted the asserted persecution. *See Oliva v. Lynch*, 807 F.3d 53, 60 (4th Cir. 2015) (holding that the BIA drew "too fine a distinction" between the "immediate trigger" for persecution – breaking the rules imposed on former gang members – and what ultimately led to persecution – protected status as a former gang member). On the IJ's own unchallenged account of the facts – that Salgado-Sosa's fear of persecution arises from the actions of his stepfather and his family – the only reasonable conclusion is that family membership is "*at least one* central reason for [his] persecution." *See Hernandez-Avalos*, 784 F.3d at 950.

Third and finally, the BIA's decision improperly focused on whether Salgado-Sosa's *family* was persecuted on account of a protected ground, rather than on whether *Salgado-Sosa* was persecuted because of a protected ground – here, his relationship to his family. The critical fact, for the BIA, was that the motive for the attacks on Salgado-

12

Sosa's family was "financial gain or personal vendettas," neither of which is itself a protected ground under the INA. J.A. 6. But as we have explained before, it does not follow that if Salgado-Sosa's family members were not targeted based on some protected ground, then Salgado-Sosa could not have been targeted based on his ties to his family. *Cordova v. Holder*, 759 F.3d 332, 339 (4th Cir. 2014) (rejecting argument that feared persecution is not on account of membership in family if attacks on family are not related to protected ground). Instead, "[t]he correct analysis focuses on [Salgado-Sosa himself] as the applicant, and asks whether [he] was targeted because of [his] membership in the social group consisting of [his] immediate family." *Villatoro v. Sessions*, 680 F. App'x 212, 221 (4th Cir. 2017). And once the right question is asked, the record admits of only one answer: whatever MS-13's motives for targeting Salgado-Sosa's family, Salgado-Sosa himself was targeted because of his membership in that family.

For all these reasons, it is clear that Salgado-Sosa has shown the required nexus between anticipated persecution and membership in a particular social group consisting of his family. Specifically, Salgado-Sosa has demonstrated that "at least one central reason" for the harm he faces is his connection to his stepfather and family. *See* 8 U.S.C. § 1158(b)(1)(B)(i). Because the IJ and BIA relied exclusively on an erroneous determination as to nexus in denying withholding of removal, we vacate that denial and remand for further proceedings regarding Salgado-Sosa's application.

**B.**

As discussed above, Salgado-Sosa's asylum application was denied not on the merits, but because it was filed outside the one-year statutory deadline. On appeal,

13

Salgado-Sosa separately challenges that determination, arguing that he qualifies for the "changed circumstances" exception that would allow consideration of his late-filed application. *See* 8 U.S.C. § 1158(a)(2)(D).

As the government notes, we generally lack jurisdiction to review discretionary determinations that an asylum applicant failed to establish changed circumstances. *See* 8 U.S.C. § 1158(a)(3); *Gomis v. Holder*, 571 F.3d 353, 358–59 (4th Cir. 2009). But we do have jurisdiction when an appeal "present[s] a constitutional claim or question of law." *Mulyani v. Holder*, 771 F.3d 190, 197 (4th Cir. 2014) (citing 8 U.S.C. § 1252(a)(2)(D)). Salgado-Sosa contends that his argument on appeal – that this Court's decision in *Crespin-Valladares*, recognizing family as a "particular social group" protected under the INA, constitutes a change in circumstances – presents a reviewable question of law.

There is a separate reason, however, that we may not address that argument here. The BIA declined to reach Salgado-Sosa's argument because it was not raised before the IJ as a ground for overcoming the time bar. When the BIA does not reach a claim because it was not presented to the IJ, a petitioner has failed to exhaust his administrative remedies. *See Massis v. Mukasey*, 549 F.3d 631, 638–40 (4th Cir. 2008); *see also Jing Jiang v. Holder*, 475 F. App'x 486, 488 (4th Cir. 2012). And under 8 U.S.C. § 1252(d)(1), we are jurisdictionally barred from reviewing unexhausted claims.

Ordinarily, this would end our inquiry. But after briefing and argument in this case, we decided *Zambrano v. Sessions*, 878 F.3d 84 (4th Cir. 2017). There, we considered whether the "intensification" of a preexisting threat of persecution qualifies as

14

a "changed circumstance" for purposes of § 1158(a)(2)(D)'s exception. *Id.* at 88. We held that it does, and that the BIA had applied the wrong legal standard by failing to consider "[n]ew facts that provide additional support for a pre-existing asylum claim." *Id.*

In this case, as the IJ explained, Salgado-Sosa argued that "he qualifies for the changed circumstances exception because conditions in Honduras have deteriorated," pointing to the 2009 coup in that country as the source of "increased concerns" about the government's ability to control MS-13 and protect Salgado-Sosa from harm. J.A. 126. The IJ rejected that argument, reasoning that the underlying source of Salgado-Sosa's fear – gang attacks on him and his family – had not changed, and the Board affirmed without further analysis.

Because the IJ and BIA conducted their proceedings before *Zambrano*, they would have had no reason to depart from what was then agency policy and consider Salgado-Sosa's "intensification" argument and any supporting evidence. In light of *Zambrano*, however, the failure to consider such a claim and associated evidence would constitute error. 878 F.3d at 88–89. Because neither the parties nor the BIA has had an opportunity to address whether and to what extent *Zambrano* affects Salgado-Sosa's changed circumstances claim, a remand to the agency is proper. *See Nken v. Holder*, 585 F.3d 818, 821–23 (4th Cir. 2009); *see also* 8 U.S.C. § 1252(b)(4)(A). We therefore vacate the denial of Salgado-Sosa's asylum application and remand to the BIA for further proceedings in light of *Zambrano v. Sessions*, 878 F.3d 84 (4th Cir. 2017).

15

## III.

For the foregoing reasons, we grant in part Salgado-Sosa's petition for review with respect to his eligibility for asylum and withholding of removal, deny in part with respect to his claim under the CAT, and remand the case to the BIA for further proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED*
*IN PART, DENIED IN PART, AND*
*REMANDED FOR FURTHER PROCEEDINGS*

16