**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1302**

GUADALUPE DIAZ-VELASQUEZ,

Petitioner,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: May 7, 2019                                   Decided: June 25, 2019

Before HARRIS, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

Petition for review granted in part, denied in part, and dismissed in part; remanded for further proceedings by unpublished opinion. Judge Harris wrote the opinion, in which Judge Richardson joined. Judge Quattlebaum wrote a separate concurring opinion.

**ARGUED:** Anser Ahmad, AHMAD & ASSOCIATES, McLean, Virginia, for Petitioner. Paul Fiorino, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Joseph E. Hunt, Assistant Attorney General, Rebekah Nahas, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

Guadalupe Diaz-Velasquez testified credibly that he fled Guatemala after he was threatened and attacked by MS-13 gang members who were attempting to extort his family. Fearing further attacks if he is returned to Guatemala, Diaz-Velasquez now seeks relief, primarily in the form of withholding of removal.

An immigration judge and the Board of Immigration Appeals initially rejected Diaz-Velasquez's application for withholding, finding that he failed to show the requisite "nexus" between MS-13's threats against him and his membership in a cognizable "particular social group" – here, his family. We vacated the Board's decision and remanded so that the agency could reconsider its nexus determination in light of intervening precedent counseling against "an excessively narrow reading" of the nexus requirement as applied to gang threats made to family members, *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015). On remand, the Board again found that Diaz-Velasquez could not show the necessary nexus between his family status and the threats to his safety.

We conclude that the Board erred in holding that Diaz-Velasquez did not meet the nexus requirement. The record compels the conclusion that at least one central reason for Diaz-Velasquez's past victimization was his membership in his family, a protected social group under the Immigration and Nationality Act. Accordingly, we vacate the denial of withholding of removal, and remand for further proceedings on that claim.

**I.**

2

Guadalupe Diaz-Velasquez entered the United States without inspection in December 2000. Approximately 11 years later, the Department of Homeland Security served him with a notice to appear, charging him as removable for being present in the United States without proper admission or parole, *see* 8 U.S.C § 1182(a)(6)(A)(i). Diaz-Velasquez conceded his removability, but applied for withholding of removal under the Immigration and Nationality Act.[1]

We begin by summarizing the testimony and evidence Diaz-Velasquez presented at his removal hearing and then outline the legal proceedings that followed.

**A.**

Diaz-Velasquez was born in rural Guatemala, where his family owned a small coffee bean farm. When he was 11 or 12 years old, members of the gang Mara Salvatrucha, known as "MS-13," threatened and attempted to extort his father. Instead of yielding to the gang's threats, Diaz-Velasquez's father fled their home. Neither Diaz-Velasquez nor his family knew where his father had fled or even if he was alive.

One month after his father's disappearance, gang members returned and threatened Diaz-Velasquez, who was the oldest remaining male in the family. They gave Diaz-

---

[1] Diaz-Velasquez also applied for asylum and for protection under the Convention Against Torture. As we explained in our previous decision, we lack jurisdiction to review the agency's finding that Diaz-Velasquez's asylum application was untimely. *Diaz–Velasquez v. Lynch*, 622 F. App'x 241, 242 (4th Cir. 2015) (per curiam). To the extent Diaz-Velasquez continues to challenge that determination, we dismiss that portion of his petition for review. We also held in our previous decision that Diaz-Velasquez had waived appellate review of his claim under the Convention Against Torture. *Id.* at 242 n.*. Accordingly, our review here is limited to Diaz-Velasquez's withholding of removal claim.

Velasquez 48 hours to turn his father over to the gang. After the 48 hours passed, gang members kidnapped Diaz-Velasquez on his way home from school, blindfolded him, and threatened to cut off his thumb if he did not tell them his father's whereabouts. Because Diaz-Velasquez did not know where his father was, he had no answer, and the gang members slashed his thumb, leaving him with permanent scarring and nerve damage. The gang then gave Diaz-Velasquez an additional 30 days to locate his father.

Still unaware of his father's whereabouts and fearful of another attack, Diaz-Velasquez and his mother went to the authorities. They first contacted the town commissioner, who, fearing his own family would be harmed by MS-13, refused to take any action against the gang. Diaz-Velasquez then walked three hours to the nearest police station. Like the town commissioner, however, the police refused to intervene, and instead advised Diaz-Velasquez and his family to "cooperate" with the gang members. J.A. 225.

Unable to secure help from the authorities, Diaz-Velasquez stopped attending school and then fled Guatemala altogether, moving first to Mexico and eventually to the United States. Diaz-Velasquez's family moved away from their hometown but remained in Guatemala, where they continued to live at the time of the agency proceedings.

**B.**

To qualify for withholding of removal, an applicant must establish a clear probability that he will be persecuted – that is, his "life or freedom w[ill] be threatened" – in the proposed country of removal on account of one of several protected grounds, including race, religion, nationality, political opinion, or membership in a particular social group. 8 U.S.C. § 1231(b)(3)(A); *see also Salgado-Sosa v. Sessions*, 882 F.3d 451, 456

4

(4th Cir. 2018); 8 C.F.R. § 1208.16(b). Persecution is "on account of" a protected ground when that ground is "at least one central reason" for the harm faced by the applicant, *Salgado-Sosa*, 882 F.3d at 457 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).

Generally, the applicant bears the burden of showing the likelihood of future persecution. 8 C.F.R. § 1208.16(b). But if an applicant has suffered past persecution on account of a protected ground, then he is entitled to a presumption that he would face similar persecution in the future. *Id.* § 1208.16(b)(1)(i); *see also Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015). The government may rebut that presumption by establishing that circumstances have changed "fundamental[ly]" since the original persecution or that the applicant reasonably could avoid a future threat by relocating to a different part of the proposed country of removal. 8 C.F.R. § 1208.16(b)(1)(i)(A)–(B).

Before the immigration judge ("IJ"), Diaz-Velasquez argued that he was entitled to a presumption of future persecution because MS-13 previously persecuted him on account of a protected ground – specifically, his membership in the "particular social group" of his family. The IJ credited Diaz-Velasquez's account of the gang's attack and threats against him. Nevertheless, he held, Diaz-Velasquez could not establish past persecution. Diaz-Velasquez's family qualified as a "particular social group," the IJ recognized, but Diaz-Velasquez had not shown that MS-13's threats were the result of those family ties, rather than "an effort to find [his] father so that [the gang] could extort money and land." J.A. 169–70. Accordingly, Diaz-Velasquez was not entitled to a presumption of future persecution. Nor, the IJ concluded, could Diaz-Velasquez meet his burden of proof by affirmatively demonstrating likely future persecution, given that his family continued to

live in Guatemala without incident.

In a single-member decision, the Board of Immigration Appeals ("BIA" or "the Board") affirmed the IJ's findings and dismissed Diaz-Velasquez's appeal. With respect to Diaz-Velasquez's claim of past persecution, the Board agreed that Diaz-Velasquez "did not establish the required nexus" between his membership in his family and the threats against him: Diaz-Velasquez was targeted "as a consequence of the gang members' efforts to find his father . . . to extort him, not because of their desire to punish [Diaz-Velasquez] because of his membership in his stated particular social group." J.A. 95.

Diaz-Velasquez appealed to this court, and we remanded his withholding claim for reconsideration in light of intervening circuit precedent. *See Diaz–Velasquez v. Lynch*, 622 F. App'x 241, 242 (4th Cir. 2015) (per curiam). Specifically, we cited our then-recent decision in *Hernandez-Avalos*, 784 F.3d at 949–50, in which we held that an applicant had shown the requisite nexus between a gang's threats against her and her family ties and that the agency's contrary determination was manifestly contrary to law and an abuse of discretion. The agency, we explained, had taken an "excessively narrow" approach to the nexus requirement in the context of gang threats to family members. *Id.* at 949.

On remand, the IJ again found that Diaz-Velasquez could not establish the necessary nexus by showing that his family membership was "at least one central reason" for the gang's threats against him. J.A. 33–34 (internal quotation marks omitted). *Hernandez-Avalos* was distinguishable, the IJ reasoned, because that case involved threats against a mother demanding that she turn her son over to a gang, "meaningful only because of her maternal authority" over her son, whereas in this case, Diaz-Velasquez had no authority

6

over his father. J.A. 34 (internal quotation marks omitted). Instead, Diaz-Velasquez "was harmed as a consequence of the gang members' efforts to find his father to extort him, [] not on account of his membership in his family." *Id.* (emphasis omitted). As a result, the IJ again concluded, Diaz-Velasquez did not "benefit from a presumption" of future persecution and instead bore the burden of demonstrating a likelihood that he would be persecuted if returned to Guatemala – which he could not do, because his family had remained in Guatemala for roughly 25 years without "further trouble." J.A. 34–35.

The BIA again affirmed the IJ's findings in a single-member decision and dismissed Diaz-Velasquez's appeal. Like the IJ, the BIA found *Hernandez-Avalos* distinguishable because that case involved threats to a "mother with parental authority and influence" over her son. J.A. 4. Here, by contrast, Diaz-Velasquez was threatened because the gang thought he had information about his father's whereabouts – a fate that could have befallen any person with information about the father, regardless of familial status. The Board also agreed with the IJ that Diaz-Velasquez did not demonstrate a "clear probability" of future persecution in Guatemala, "[g]iven the absence of harm to similarly situated family members" in the country. *Id.*

Diaz-Velasquez timely petitioned this court for review.

## II.

Because the Board affirmed the IJ's findings with an opinion of its own, we review both decisions. *Sanchez v. Sessions*, 885 F.3d 782, 786 n.2 (4th Cir. 2018). We review factual findings under the substantial evidence standard, and will reverse only where "a

7

reasonable adjudicator would be compelled to reach a contrary conclusion." *Cruz v. Sessions*, 853 F.3d 122, 128, 130 (4th Cir. 2017). Legal determinations are reviewed de novo. *Id.* at 128.

On appeal, Diaz-Velasquez argues that the BIA erred in denying his application for withholding of removal because he is entitled to a presumption, based on his past persecution, that his "life or freedom would be threatened" in Guatemala. For that presumption to apply, Diaz-Velasquez must establish, first, that he previously suffered harm rising to the level of persecution in Guatemala, and, second, that such harm was "on account of" a protected ground. *See* 8 C.F.R. § 1208.16(b)(1)(i).

Because the IJ and BIA proceeded directly to the "nexus" requirement in rejecting Diaz-Velasquez's withholding claim, we begin our analysis there. We then turn to whether Diaz-Velasquez's past harm rises to the level of persecution and to the remaining aspects of his withholding claim.

**A.**

Diaz-Velasquez argues that the harm he suffered at the hands of MS-13 was the result of a protected ground – specifically, his membership in the "particular social group" of his family. As the IJ and Board recognized, our precedent makes clear that an applicant's "family qualifies as a 'particular social group,' protected for purposes of . . . withholding of removal." *Salgado-Sosa*, 882 F.3d at 457. The dispute here is over the nexus requirement: whether Diaz-Velasquez established that MS-13 targeted him "on account of" his family ties. We hold that the record in this case, measured against our binding precedent, compels the conclusion that family membership was "at least one central

8

reason" why Diaz-Velasquez, and not some other person, was targeted by MS-13, and therefore reverse the agency's contrary determination. *See Hernandez-Avalos*, 784 F.3d at 950 (reversing, as manifestly contrary to law and an abuse of discretion, agency determination of lack of nexus because "any reasonable adjudicator would be compelled" to conclude that family membership was one central reason for gang threats); *see also Salgado-Sosa*, 882 F.3d at 457 (reversing agency determination of lack of nexus because court was "compelled to conclude" that kinship ties were at least one central reason for gang threats (internal quotation marks omitted)).

The standard that governs the nexus inquiry is clear and well established. Persecution is "on account of" a protected ground so long as that protected ground is "at least one central reason" for the persecution. *Hernandez-Avalos*, 784 F.3d at 949 (internal quotation marks omitted). "To prove that persecution took place on account of family ties," in other words, an applicant "need not show that his family ties provide *the* central reason or even a dominant central reason" for the persecution; it is enough that family status is "more than an incidental, tangential, superficial, or subordinate reason." *Id.* (internal quotation marks omitted). Even where a gang has additional, unprotected grounds for a threat – for instance, recruiting new members into its ranks – the nexus requirement is satisfied if a family connection is one of "multiple central reasons" for the persecution, explaining why a particular person, and not somebody else, has been targeted. *Id.* at 950.

Under that standard, we are compelled to conclude that Diaz-Velasquez's connection to his father was "at least one central reason" "why [he], and not another person, was threatened," *id.*, by MS-13. Diaz-Velasquez's credited testimony establishes that

9

when he was just 11 or 12 years old, MS-13 members kidnapped him outside of school, threatened to cut off his thumb, and threatened to kill him and his family – all because the gang was looking for his father. That familial relationship is the only fact in the record that can explain why the gang targeted Diaz-Velasquez, and not somebody else, in its efforts to find his father – why MS-13 assumed (incorrectly) that this particular school boy might know the whereabouts of the man for whom they were searching, or that its threats might prompt the man to reveal himself in order to protect the boy. On this record, we can conclude only that MS-13 singled out Diaz-Velasquez in order to exploit his kinship connection to his father, and that is enough to satisfy the nexus requirement. *See id.* (nexus requirement met where gang targeted mother in order to "leverage[]" mother-son relationship).

The agency's contrary determination cannot be reconciled with our precedent. The crux of the agency's reasoning, both initially and on remand, is the same: The gang members who abused Diaz-Velasquez were motivated not by hostility to his family, but by a desire to find his father so that they could extort him. *See* J.A. 95 (finding that Diaz-Velasquez was harmed "as a consequence of the gang members' efforts to find his father . . . to extort him, not because of their desire to punish" Diaz-Velasquez for his family membership); J.A. 3 (finding that Diaz-Velasquez was "seized by gang members who were searching for his father for the purpose of extorting money and land"). But that is precisely the rationale we rejected in *Hernandez-Avalos*, deeming it an "excessively narrow" reading of the nexus requirement. 784 F.3d at 949. In that case, a mother was threatened by gang members because she refused to let her son join their ranks. *Id.* at 947. We recognized

10

that recruitment, and not a free-standing grudge against the family, was the gang's motive. *Id.* at 950. But that "recruitment motiv[e]," we explained, "did not preclude the existence of another central reason – family ties – for that same persecution," because it was the mother's tie to her son that explained why she, rather than another person, was targeted for threats. *Id.* The same rule applies here: One central reason for the gang's attacks on Diaz-Velasquez was to find and extort his father, but another of the "multiple central reasons" for the attacks – and the one that led the gang to target Diaz-Velasquez and not somebody else – was Diaz-Velasquez's "family connection" to his father, *id.*

On remand, the agency attempted to distinguish *Hernandez-Avalos*, arguing that our nexus ruling in that case applies only to fact patterns in which gangs target family members with parental "authority" over the children in whom the gangs are interested. J.A. 34 ("The [c]ourt [in *Hernandez-Avalos*] noted that the threats directed to the [mother] to turn her son over to the gang 'were meaningful only because of her maternal authority over her son's actions.'" (quoting *Hernandez-Avalos*, 784 F.3d at 950 n.7)). We cannot agree. The "maternal authority" of the mother in *Hernandez-Avalos* was relevant as one reason why gang members might rely on kinship ties to advance a gang objective, like recruitment. But there are other ways in which a family relationship may be exploited, as this case demonstrates, and *Hernandez-Avalos* stands for the broader proposition that there can be "multiple central reasons" for threats against a family member. 784 F.3d at 950.

If there were any doubt on this score, it would be resolved by our subsequent cases applying *Hernandez-Avalos* to threats against family members who do *not* have parental authority over a gang's primary target. In *Salgado-Sosa*, for instance, we held that the

11

nexus requirement was satisfied when the stepson of a man who had resisted MS-13 extortion was targeted to avenge and deter the stepfather's defiance. 882 F.3d at 457–59. We applied the logic of *Hernandez-Avalos*, reasoning that although the "immediate trigger" for MS-13's attacks on the stepson was revenge or greed, the stepson's family tie to his stepfather was "why he, and not another person," was singled out, making it "at least one of multiple central reasons" for the gang's abuse. *Id.* at 458 (internal quotation marks, alterations, and emphasis omitted). And in *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 249–50 (4th Cir. 2017), we expressly rejected the BIA's efforts to distinguish *Hernandez-Avalos*, and instead applied it where a daughter was threatened immediately after her father refused to comply with a gang's extortionate demands. Under our case law, "parental authority" – exercised by neither stepson Salgado-Sosa nor daughter Zavaleta Policiano – is not the key to the nexus inquiry.

The agency also suggested that MS-13's threats against Diaz-Velasquez were not "on account of" his family membership because they "could have been directed at anyone who had information concerning the father's whereabouts." J.A. 34. But the question is not whether the threats *could* have been directed at someone else; it is whether Diaz-Velasquez's family tie to his father is at least "one central reason" why they *were*, in fact, directed at *him*. *See Hernandez-Avalos*, 784 F.3d at 950. And as discussed above, there is no record evidence that the gang would have targeted Diaz-Velasquez in its efforts to locate his father absent that kinship connection. It is Diaz-Velasquez's relationship to his father, that is, that explains why he, rather than some other person, was thought to be a promising means of locating the missing extortion victim, and thus singled out for the gang's abuse.

12

*See Zavaleta-Policiano*, 873 F.3d at 250 (holding that nexus requirement was satisfied because "Zavaleta Policiano's relationship to her father is why she, rather than some other person, was targeted for extortion").

"This is not to say," as we clarified in *Hernandez-Avalos*, that "every threat that references a family member is made on account of family ties." 784 F.3d at 950 n.7. In that case, for instance, we found that "[i]t may well be" that a separate threat against the applicant – warning her not to identify gang members to the authorities as the men responsible for killing her cousin-in-law – was not a result of that family relationship, but instead a general effort to stop anyone who knew of the gang's criminal activities from reporting them. *Id.* And there likely will be other cases in which a family connection is merely "incidental" or "tangential" to gang persecution, *id.* at 949 (internal quotation marks omitted), doing nothing to explain why a particular person was singled out by the gang. Here, however, the record compels the conclusion that Diaz-Velasquez's connection to his father was "at least one central reason" why he, rather than another person, was targeted by gang members searching for his father, *id.* at 950. Under our precedent, Diaz-Velasquez has satisfied the nexus requirement.[2]

### B.

Our nexus determination does not by itself resolve Diaz-Velasquez's claim for withholding of removal. First, in order to invoke the presumption of future persecution,

---

[2] At oral argument, the government took the straightforward position that our precedent on this issue is incorrect. But one panel, of course, may not overrule the holding of an earlier panel, *United States v. Spinks*, 770 F.3d 285, 289–90 (4th Cir. 2014), and we follow the precedent of our court.

Diaz-Velasquez must show not only that he has been subjected to past abuse "on account of" his family membership, but also that the past abuse rose to the level of "persecution." *See* 8 C.F.R. § 1208.16(b)(1)(i). "To constitute persecution, actions must rise above the level of mere harassment, and must be of sufficient severity that they constitute a threat to life or freedom itself." *Cortez-Mendez v. Whitaker*, 912 F.3d 205, 209 n.* (4th Cir. 2019) (internal quotation marks and citations omitted). Here, Diaz-Velasquez testified – and credibly so – that he was kidnapped, threatened with death, and physically harmed. That testimony certainly suggests something more than "mere harassment." *See Zavaleta-Policiano*, 873 F.3d at 247 (threat of death qualifies as persecution). But neither the IJ nor the BIA has made an express finding on this point, and as a general rule, "the proper course" where the agency has not resolved an issue in the first instance "is to remand to the agency for additional investigation or explanation." *INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam) (internal quotation marks omitted). We therefore remand to the BIA to determine in the first instance whether the harm Diaz-Velasquez suffered in Guatemala constitutes persecution.

If it does, then Diaz-Velasquez is entitled to a presumption that his life or freedom would be threatened in Guatemala. That still would not close the matter, however, because the government may rebut that presumption by showing either a "fundamental change" in circumstances since the original persecution, or the viability of relocation within Guatemala as a means of avoiding future persecution. 8 C.F.R. § 1208.16(b)(1)(i)(A)–(B). Given the evidence that Diaz-Velasquez's family has remained in Guatemala for roughly 25 years with no further incident, the government may be able to meet its burden in this

14

case.  Again, however, neither the IJ nor the BIA has considered that question:  Because both took the view that Diaz-Velasquez was not entitled to a presumption of future persecution, both considered only whether Diaz-Velasquez could demonstrate affirmatively, without the aid of the presumption, a likelihood of future persecution.  *See* J.A. 4 (affirming IJ determination that Diaz-Velasquez "did not establish a clear probability of persecution in Guatemala"); J.A. 34–35 (finding that Diaz-Velasquez "bears the burden of demonstrating that it is more likely than not that he would be subject to persecution on account of a protected ground" if removed to Guatemala and that he cannot meet that burden).  So here again, we remand to the BIA to consider whether, assuming the presumption of future persecution applies, the government can rebut that presumption.

### III.

For the foregoing reasons, we grant Diaz-Velasquez's petition for review with respect to his claim for withholding of removal.  The Board's decision on that claim is vacated, and its determination that Diaz-Velasquez failed to satisfy the nexus requirement is reversed.  We remand that claim to the Board for further proceedings consistent with this opinion.  To the extent Diaz-Velasquez's petition for review challenges the denial of his asylum claim, it is dismissed for lack of jurisdiction, and to the extent the petition challenges the denial of protection under the Convention Against Torture, it is denied.

*PETITION FOR REVIEW GRANTED IN PART, DENIED IN PART,*
*AND DISMISSED IN PART; REMANDED FOR FURTHER PROCEEDINGS*

15

QUATTLEBAUM, Circuit Judge, concurring:

I concur in the majority's opinion which appropriately follows Fourth Circuit precedent. In fact, I believe that this panel has no choice but to reverse and remand based on that precedent. *See Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 337 n.7 (4th Cir. 1996). I write separately, however, because I believe that precedent regrettably deprives immigration judges of their proper discretion to make factual determinations on issues like the one before us.

We have held that to qualify for withholding of removal, the petitioner must establish a nexus between persecution and a protected ground. *See Salgado-Sosa v. Sessions*, 882 F.3d 451, 457 (4th Cir. 2018). We have further held to establish that nexus, the petitioner must show that membership in a particular social group is "at least one central reason" for the harm faced. *Id.* at 459 (citing 8 U.S.C. § 1158(b)(1)(B)(i)). Here, the protected ground at issue is membership in a particular social group—Diaz- Velasquez's family. Thus, our pivotal question is whether his family was one of the central reasons for his persecution. It is not enough to be an incidental, tangential, superficial or subordinate reason for the persecution. *See Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015).[*]

In resolving this issue, we have held that the assessment of a persecutor's motivation is a question of fact. *See Cruz v. Sessions*, 853 F.3d 122, 128 (4th Cir. 2017). To that end,

---

[*] If Diaz-Velasquez establishes that he suffered past persecution on account of his family ties, he is entitled to the presumption that he will suffer persecution if he is returned to his country. 8 C.F.R. § 1208.16(b)(1)(i).

16

we review the immigration judge and the BIA's determination of this factual question under the deferential substantial evidence standard. *Id.* That of course means we are to treat the immigration judge's factual findings as conclusive unless a reasonable adjudicator would be compelled to reach a contrary conclusion. *Id.*

But despite professing allegiance to this standard, in my view, our decisions indicate otherwise. Based largely on our interpretation of the term "central," we have repeatedly reversed denials of applications for asylum or withholding of removal based on evidence in the record inconsistent with the position that family ties were a central reason for the persecution. Under our precedent, an immigration judge cannot rely on the reason the persecutor articulates for the persecution. *See, e.g.*, *Hernandez-Avalos*, 784 F.3d at 947; *Cruz v. Sessions*, 853 F.3d at 126. An immigration judge cannot rely on the fact that threatening notes do not mention family. *See, e.g.*, *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 245 (4th Cir. 2017). An immigration judge cannot rely on the triggering event for the persecution. *See, e.g.*, *Salgado-Sosa*, 882 F.3d at 458. An immigration judge cannot rely on the fact that the family as a whole was not the target. *See, e.g.*, *Crespin-Valladares v. Holder*, 632 F.3d 117, 127, n.6 (4th Cir. 2011). Perhaps in those cases there was conflicting evidence that family ties were a central reason for the persecution. But the immigration judges who observed the witnesses, reviewed the evidence first hand and based their decisions on information in the record, found otherwise. By reversing those decisions, we have deviated from the standard of review we insist we are applying.

The case before us today further illustrates the point. Here, the immigration judge concluded that Diaz-Velasquez failed to establish membership in his nuclear family was a

17

central reason for his past persecution. With the record evidence in view, he concluded that Diaz-Velasquez had no control over his father or his whereabouts and that he was harmed because gang members were trying to find his father, not because of his membership in the family. The judge concluded the same threats could have been directed at anyone who had information about the father.

The immigration judge's determination was based on the evidence in the record. For example, Diaz-Velasquez's father abandoned his family a month before the incident and Diaz-Velasquez never saw him again. The attack on Diaz-Velasquez was a single event. In the almost twenty-five years following the isolated incident, neither Diaz-Velasquez's mother or any of his six siblings were threatened or harmed. In fact, they all remained in Guatemala without incident. No other family members were subsequently targeted by gang members in order to find Diaz-Velasquez. Even Diaz-Velasquez's father relocated within Guatemala and thereafter remained in the country. There is no evidence that he has been harmed either.

The immigration judge made a specific finding of fact about the persecutor's motives, based on the evidence in the record. And based on this evidence, the judge, in my view, could reasonably find that the motivation of the persecutor was to learn the whereabouts of Diaz-Velasquez's father, information that could be asked of anyone— family member or not—who might know of his location. For that reason, it would be reasonable for the judge to conclude Diaz-Velasquez's familial relationship was only incidental to that central motivation. Therefore, under the substantial evidence standard, I do not believe we should disturb that decision.

Nonetheless, I agree with the majority that our precedent precludes this result. In attempting to distinguish this case from our precedent, the immigration judge erred legally. And because I am constrained by our current precedent, I agree this matter should be reversed and remanded.

But we have overstepped our bounds. Our role in these cases is "most narrow, exceedingly deferential, and 'recognizes the respect we must accord both the BIA's expertise in immigration matters and its status as the Attorney General's designee in deportation decisions.'" *Menghesha v. Gonzales*, 450 F.3d 142, 152 (4th Cir. 2006) (Williams, J., dissenting) (quoting *Huaman-Cornelio v. BIA,* 979 F.2d 995, 999 (4th Cir. 1992)). Congress charges the Attorney General with the administration and enforcement of the Immigration and Nationalization Act in this context, and for that reason, "judicial deference to the Executive Branch is especially appropriate in the immigration context." *See I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999). Despite our obligation to defer and our recognition of that obligation, our decisions have regrettably done the opposite. With the utmost respect for my colleagues, our recent decisions prevent immigration judges from doing their very important job and make the discretion we claim to afford them an illusion.