**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1393**

DOUGLAS LEKE,

        Petitioner,

    v.

MERRICK B. GARLAND, Attorney General,

        Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: March 11, 2021                           Decided: June 23, 2021

Before GREGORY, Chief Judge, and AGEE and DIAZ, Circuit Judges.

Petition for review denied by unpublished per curiam opinion.

**ARGUED:** Danielle L.C. Beach-Oswald, BEACH-OSWALD IMMIGRATION LAW ASSOCIATES, PC, Washington, D.C., for Petitioner. Karen L. Melnik, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Ethan P. Davis, Acting Assistant Attorney General, Bernard A. Joseph, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Douglas Leke, a native and citizen of Cameroon, petitions for review of a Board of Immigration Appeals order dismissing his appeal of an Immigration Judge's ("IJ") decision denying his application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Leke argues that he was deprived of a full and fair hearing and that the Board erred in upholding the IJ's decision. For the following reasons, we deny the petition for review.

## I.

### A.

Leke applied for a tourist visa to the United States in April 2018. His application was denied after he appeared for a consular interview in Cameroon. Leke later entered the U.S. without a valid entry document. He was taken into custody after a credible fear interview and placed in removal proceedings.

Leke claims that he fled Cameroon after being persecuted for an imputed political opinion. According to Leke, the military suspected him of being an Anglophone separatist—which he maintains he isn't—and began persecuting him less than two weeks after his visa application was denied. Soldiers beat, arrested, and imprisoned him in late May 2018, but he escaped about a month later during a nighttime assault on the prison.

After spending several months in hiding with his wife and infant daughter, Leke claims he returned to his apartment to pack up his things, only for soldiers to beat and arrest him a second time. But he again escaped custody as the soldiers were escorting him to

2

their vehicle to transport him back to prison. The soldiers then returned to Leke's apartment and burned it down.

Leke claims that his uncle's friend smuggled him out of Cameroon a few weeks later. He traveled through thirteen countries en route to the U.S., eventually arriving in San Ysidro, California (where he was detained).[1]

B.

Leke admitted the factual allegations in his Notice to Appear and conceded removability. He then applied for asylum, withholding of removal, and CAT protection and received an evidentiary hearing before an IJ.

Leke appeared at his hearing by video from a detention facility. The attorneys representing Leke and the government appeared in-person. During Leke's direct examination, there were several interruptions with the video connection between Leke and the courtroom. In response, the IJ brainstormed about how to handle the technical issues and said that she would continue the hearing if necessary. Leke's attorney suggested that Leke testify by telephone instead. After some back and forth, the IJ directed that Leke be moved to a different hearing room at the detention facility. The technical problems ended after Leke was moved, and the hearing proceeded without further incident.[2]

---

[1] Leke had only a single document (from Mexico) with him when he was detained. He claims that he destroyed his passport midway through his journey in Panama. He also claims that he was issued documents by a few countries besides Mexico, but that those documents went missing before he arrived in the U.S.

[2] The technical issues are documented in the administrative record and make up approximately 20% of the total hearing transcript.

After the hearing, the IJ held the record open for a week to allow Leke to offer additional evidence to corroborate his claims. The IJ then issued a written decision denying Leke relief from removal, making an adverse credibility finding and holding that Leke didn't provide sufficient independent corroborating evidence to carry his burden of proof. The IJ specifically noted that the technical issues affected neither her ability to evaluate Leke's demeanor nor her credibility determination.

Leke appealed to the Board and argued that there wasn't substantial evidence for an adverse credibility finding, that the IJ conflated the credibility and corroborating evidence analyses, and that the technical issues constituted a due process violation.

The Board dismissed Leke's appeal, adopting and affirming the IJ's decision. The Board specifically found that the IJ's adverse credibility finding wasn't clearly erroneous and rejected Leke's argument that the IJ conflated the credibility and corroborating evidence analyses. The Board also held that the technical issues didn't violate Leke's due process rights because the record supported the IJ's adverse credibility finding even without her demeanor findings, and because Leke provided no evidence that he was prejudiced by the technical issues.

Leke timely petitioned for review of the Board's order.

## II.

Leke contends that (1) the technical issues during his hearing violated his due process rights, (2) there wasn't substantial evidence for the IJ's adverse credibility finding, and (3) the Board erred by finding that the IJ didn't conflate the credibility and

4

corroborating evidence analyses and by failing to properly consider his country conditions evidence.

We first address Leke's due process claim and then consider whether the Board erred in denying him relief from removal.

A.

Leke argues that the technical issues during his evidentiary hearing were so severe that they amounted to a due process violation. We review de novo a claim that procedures used during a petitioner's asylum hearing violated his due process rights. *Rusu v. INS*, 296 F.3d 316, 320 (4th Cir. 2002). "In order to prevail on a due process challenge to a deportation or asylum hearing, an alien must demonstrate that he was prejudiced by any such violation." *Id.* This means that "we may only find prejudice when the rights of an alien have been transgressed in such a way as is likely to impact the results of the proceedings." *Id.* (cleaned up).

Leke relies on *Rusu*, where we explained that the Supreme Court's decision in *Mathews v. Eldridge* guides us in "assessing whether a deportation or asylum hearing has comported with due process." *Id.* at 321 (citing 424 U.S. 319, 333 (1976)). Under *Mathews*, "the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," but that has "different meanings in different circumstances." *Id.* Due process calls only "for such procedural protections as the particular situation demands." *Id.* In the asylum context, due process simply requires that a petitioner "receive a full and fair hearing on [his] claims." *Id.* at 321–22.

5

We agree with the Board that Leke received a full and fair hearing on his claims despite the temporary technical issues. Though *Rusu* acknowledges the potential problems inherent in conducting asylum hearings via video (which regulations permit), it doesn't help Leke. There, the petitioner's three-hour hearing was "plagued by communication problems" stemming from the petitioner's decision to decline an interpreter and testify in English, his inability to speak clearly due to his damaged mouth and missing teeth, and various technical issues. *Id.* at 319. In combination, these problems made it extremely difficult for anyone to understand anyone else—the petitioner, attorneys, IJ, and court reporter had persistent trouble understanding each other throughout the hearing. *Id.*

We nonetheless opined that the petitioner "seems to have had an opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 324. In reaching this conclusion, we reasoned that "at least part" of the petitioner's inability to communicate "resulted from his decision to testify in English" and, "to the extent that [his] problems were self-inflicted, [the petitioner] is unable to seek relief from the judiciary." *Id.*

We also found it significant that "throughout the hearing, the IJ made a sincere effort to understand [the petitioner's] testimony . . . provid[ing] him with numerous opportunities to elaborate and clarify it"; the petitioner "was afforded a substantial amount of time to explain the basis of his claim"; and "[t]he record demonstrated that, by the end of the hearing, the IJ understood the factual predicate for" the petitioner's application.[3] *Id.*

---

[3] We ultimately chose not to "definitely resolve" whether the *Rusu* petitioner received a full and fair hearing, instead relying on our finding that he was "unable, in any event, to show any prejudice resulting from a due process violation." *Id.*

The communication problems during Leke's hearing fell far short of those in *Rusu*. Leke points to select quotations from the hearing transcript that make the technical issues (and the IJ's reaction to them) sound awful. But in context, the comments Leke emphasizes were made during a casual conversation with Leke's counsel while everyone waited for technical support to address the issues. Moreover, the problems were confined to a discrete portion of the hearing, the IJ took them seriously and considered a variety of potential solutions, and they were fully resolved by moving Leke to another room.[4] And we see no evidence that the IJ didn't make a sincere effort to understand Leke or failed to give him plenty of time to testify (in fact, it was Leke's lawyer who suggested that she could try to narrow Leke's testimony if the technical issues continued).

In any event, Leke can't demonstrate that he was prejudiced by the technical issues. Leke argues that he was unfairly found to lack credibility because the issues prevented the IJ from being able to assess his demeanor accurately. But not only did the IJ note the exact opposite in her decision, she also expressed concerns with Leke's demeanor and the plausibility of his testimony throughout the hearing—both before the technical issues started and after they ceased. And the IJ's decision details numerous reasons for her adverse credibility finding, only one of which was Leke's demeanor. Finally, Leke never

---

[4] Leke asserts that "there was some question about sound quality, as reflected in the 44 instances in the hearing transcript where [his] testimony was marked 'indiscernible', and even the transcript" gets the name of the prison at which Leke testified he was imprisoned wrong. Petitioner's Br. at 17. But a review of the hearing transcript reveals no indication that Leke, his counsel, the government, or the IJ had any ongoing difficulty with understanding each other.

requested a continuance (despite the IJ's indication that she would have granted one). Though he now contends that the IJ's solution—moving him to another room—wasn't ideal, he's not entitled to judicial relief when he didn't object to the solution in the first place.

Accordingly, we affirm the Board in rejecting Leke's due process claim.[5]

B.

Leke also challenges the Board's decision on the merits of his claims. When reviewing a Board decision denying relief from removal, we review factual findings for substantial evidence, meaning they are conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Ai Hua Chen v. Holder*, 742 F.3d 171, 178 (4th Cir. 2014) (quoting 8 U.S.C. § 1252(b)(4)(B)). We review legal determinations de novo. *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018). When the Board affirms the IJ's decision with an opinion of its own, we review both decisions. *Id.*

Leke argues that (1) substantial evidence doesn't support the IJ's adverse credibility finding, (2) the IJ conflated the credibility and corroborating evidence analyses, and (3) the IJ and the Board failed to properly consider his country conditions evidence, especially with regards to his CAT claim. Each argument lacks merit.

---

[5] During oral argument, Leke's counsel asserted (for the first time) that the IJ violated Leke's due process rights by arbitrarily refusing to allow Leke's uncle to testify on his behalf. Not only was this argument never raised in the briefing, it also misrepresents the record. At the beginning of his hearing, Leke's attorney informed the IJ that Leke's uncle wouldn't be testifying and confirmed that he was only there for moral support. A.R. 96.

First, we agree with the Board that the IJ's adverse credibility finding wasn't clearly erroneous. The IJ detailed multiple reasons for her finding, including Leke's demeanor and responsiveness while testifying, serious documentary inconsistencies regarding where Leke lived and worked at the time of his alleged persecution (facts which go to the very heart of his claim), additional inconsistencies regarding his relationship to one of his supporting affiants, and the implausibility of his account of being imprisoned (and escaping from custody twice). In short, there's plenty of evidence to support a finding that Leke lacks credibility.

Second, we also agree with the Board that the IJ analyzed Leke's credibility and lack of sufficient independent corroborating evidence separately. As the Board explained, the IJ "first found [Leke] not credible and then determined that his corroborating evidence did not meet his burdens of proof. The [IJ] explicitly acknowledged that credible testimony alone can be sufficient to meet the burdens of proof in some cases." A.R. 4 (internal citation omitted). Simply put, there's nothing to this argument.

Third, both the IJ and the Board considered Leke's country conditions evidence; they just disagreed with Leke as to its significance. The IJ acknowledged "that the record contains substantial corroborating evidence attesting to general conditions of unrest in southwest Cameroon, and of a government crackdown that includes imprisonment, human rights abuses, and home-burning against suspected separatists." A.R. 75. "Yet," the IJ reasoned, "there is no objective and independent corroboration that [Leke] was one of the victims of the Cameroonian government's crackdown on actual and perceived dissent." *Id.* And the IJ appropriately distinguished *Camara v. Ashcroft* (the case on which Leke

continues to rely): "there, general country conditions evidence of a broader crackdown on dissent was paired with specific independent corroborating evidence that the applicant herself was among those swept up in that crackdown." *Id.* (citing 378 F.3d 361, 370 (4th Cir. 2004)). The Board agreed that Leke's "general documentation of country conditions [doesn't] establish his individual eligibility for relief." A.R. 4.

Leke nonetheless asserts that the IJ erred by failing to consider his country conditions evidence in the specific context of analyzing his CAT claim. It's true that the above analysis doesn't appear in the IJ's "Protection Under the CAT" section. *See* A.R. 77–78. However, the IJ there references her analysis "above" before finding that Leke didn't "present independent corroborating evidence proving his claim." A.R. 78. Because Leke's country conditions evidence insufficiently supports his asylum and CAT claims for the same reason—it fails to demonstrate that Leke personally experienced, or would likely experience, the Cameroonian government's harsh treatment of people it thinks are separatists—it wasn't necessary for the IJ to duplicate her reasoning.

Leke has repeatedly insisted that he isn't a separatist and isn't involved in any political group or activity in Cameroon. Absent a showing that he's been targeted in the past (which he's failed to make), there's no reason to find it likely that he'll be targeted in the future if he returns to Cameroon.

\* \* \*

Accordingly, we deny the petition for review.

*PETITION DENIED*

10